ROBERT E. SCHAAD, INDIVIDUALLY, AND OCEAN GROVE NEWS SERVICE, A NEW JERSEY CORPORATION, PLAINTIFFS-RESPONDENTS, v. OCEAN GROVE CAMP MEETING ASSOCIATION OF THE UNITED METHODIST CHURCH AND KENT A. COLE, CHIEF OF POLICE OF THE OCEAN GROVE CAMP MEETING ASSOCIATION OF THE UNITED METHODIST CHURCH, DEFENDANTS-APPELLANTS, AND WILBUR DINEGAR AND JEAN DINEGAR, DEFENDANTS.

Argued October 6, 1975—Reargued April 6, 1976—
Decided February 10, 1977.

238

*Mr. Alfred C. Clapp* and *Mr. Arnold K. Mytelka* argued the cause for appellants (*Messrs. Clapp and Eisenberg,* attorneys; *Mr. Clapp* and *Mr. Mytelka* of counsel; *Mr. Clapp* on the briefs).

*Mr. Michael D. Farren* argued the cause for respondents.

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for *amicus curiae* State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman* of counsel; *Mr. Arnold Lakind,* Deputy Attorney General, on the brief).

*Mr. Theodore Sager Meth* submitted a brief on behalf of *amicus curiae* National Council of Churches of Christ in the U. S. A. (*Messrs. Meth, Wood, Neff and Cooper,* attorneys).

The opinion of the court was delivered by

CONFORD, P. J. A. D., temporarily assigned. The principal adversaries in this litigation are plaintiffs-respondents

Robert E. Schaad and his closely held small corporation, Ocean Grove News Service,[1] on the one hand, and the defendant-appellant Ocean Grove Camp Meeting Association of the United Methodist Church[2] (hereafter "Ocean Grove" or "defendant"), on the other. As will be seen, the latter exercises, by force of statute, certain police and licensing regulatory powers similar to those of a municipality. Since enforcement of two of its police ordinances is involved, the Ocean Grove chief of police is a nominal party defendant, as were two Ocean Grove residents who precipitated this litigation by filing complaints under the ordinances against Schaad. These complainants have withdrawn from the proceedings.

The Attorney General joined as *amicus curiae* in support of the constitutionality of the ordinances prohibiting Sunday driving and certain other activities, asserting that they came within the legitimate exercise of the police power of the State. Another *amicus,* the National Council of Churches of Christ in the U.S.A., was permitted to brief the proposition that the constitutional principle of religious freedom supports the validity of the ordinances.

Plaintiff's violations of the ordinances arise from his regular delivery of several hundred copies of Sunday newspapers in Ocean Grove by truck, beginning late Saturday night and terminating in the early morning hours on the Sunday. Most of those newspapers are not obtainable by Schaad from the publisher until near midnight on Saturday. This course of conduct had been pursued for some years by the predecessor news service owner and operator from whom Schaad purchased the business in 1972. The

---

[1] We hereinafter refer to plaintiffs collectively as "Schaad" or "plaintiff".

[2] The association's name as originally chartered by the Legislature was Ocean Grove Camp Meeting Association of the Methodist Episcopal Church. *L.* 1870, *c.* 157. The change of name was authorized by *P. L. 1968, c.* 231.

distribution of newspapers and the operation of the motor vehicle in the course thereof contravened the ordinances in question which had the purpose and effect of prohibiting such activity at any time on Sundays.[3]

Subsequent to the filing against him of complaints under such ordinances, plaintiff brought an action in lieu of prerogative writs asserting various grounds of attack upon the validity of the ordinances and of the enabling statutes and seeking injunctive relief against enforcement of the ordinances.

On cross motions for summary judgment, the trial court granted judgment to plaintiff. The court found that the prohibition of newspaper deliveries on Sundays was an unconstitutional infringement of the freedom of the press and that the Sunday driving ban was a violation of the Fourteenth Amendment guaranty of due process. The court also declared the enabling statute, *N. J. S. A.* 40:97–1 *et seq.,* to be a law respecting the establishment of religion

---

[3]Ordinance 30, adopted April 20, 1928, and still in effect, provides in relevant part:

1. * * * [I]t shall be unlawful for any person * * * to * * * drive * * * an automobile or other vehicle in any street * * * in Ocean Grove upon the first day of the week, the day commonly called Sunday, * * *.

4. Any person * * * who shall violate any of the provisions of this ordinance without first securing a permit * * * to do any or all of the acts above prohibited, shall, upon conviction, forfeit and pay a fine * * *.

Ordinance 73–2, adopted April 27, 1973, provides in pertinent part:

WHEREAS, it is deemed advisable to provide for and to maintain the historic quiet Sabbath within the geographical limit of Ocean Grove as established by the founders of the Ocean Grove Camp Meeting Association, and as traditionally observed over the years by the inhabitants of Ocean Grove:

Section 1. The following shall be prohibited within the geographical limits of Ocean Grove on Sunday * * *:

A. The riding * * * of all vehicles, * * *.

B. The selling or delivering of newspapers * * *.

Section 2. Any person * * * violating any of the provisions of this ordinance shall, upon conviction, pay a fine * * * or be imprisoned * * * or both fine and imprisonment.

in violation of the First Amendment with the result that the dependent ordinances were "without any force or effect." The court granted a stay of its judgment (which stay is still extant) upon the condition that, pending appeal, plaintiff would be permitted to conduct his business as theretofore notwithstanding the ordinances.

Ocean Grove appealed from the judgment and the appeal is here by our direct certification to the Appellate Division, where it was pending unheard. *R.* 2:12–1. 68 *N. J.* 175 (1975). Ocean Grove challenges both the substance and the scope of the trial court decision in invalidating not only the two ordinances but also the statute under whose authority they were adopted.

After initial argument of the appeal in this court, we remanded the cause for amplification of the record and supplementary fact findings as to the issue whether an estoppel had arisen against defendant effective to shield plaintiff from enforcement of the ordinances. Thereupon the trial court conducted a hearing, concluded there was no basis for an estoppel and re-affirmed its previous disposition of the cause. On the evidence, we have no reason to disagree with the trial court's findings and conclusions on the question of estoppel, and we therefore proceed to examination of the issues involved in the initial disposition.

I

Before considering the legal questions regarding the statutes and ordinances before us we first outline the relevant facts. Schaad purchased the news service business in October 1972 from a predecessor who had operated it undisturbed for 13 years, making the abbreviated Sunday morning deliveries by truck. He continued this practice without incident or police objection until the formal complaints were filed in August 1974. It does not appear that the prohibition of Ordinance 30 against Sunday driving had ever been enforced with regard to the vehicular delivery of Sun-

day newspapers. Actually, the early Sunday delivery had been made to the Ocean Grove Police Headquarters, among others.

When Schaad purchased the business it was agreed with the seller that $850 of the total price of $12,000 would remain in escrow and be paid over to the seller if Schaad's operations were not stopped by Ocean Grove for a year, otherwise to be returned to the buyer.[4]

At that time Ocean Grove had a "business manager", known after 1974 as an "executive director", a Mr. Frank Henson. Two or three months after Schaad commenced business he asked Henson if he would be permitted to continue his Sunday deliveries. As requested, Schaad wrote Henson a letter explaining that his Sunday deliveries would be only until "about 2:15 A.M."; that this was necessary to serve his customers; that many of them were elderly and all depended upon his service and wished it to continue; that the survival of his business depended upon these Sunday deliveries and that every care would be taken to observe the Sunday quiet of the community. The letter was discussed by Henson with the "business committee" of Ocean Grove, and since it was established that no one had ever complained about the deliveries the committee took no action to prohibit their continuance. On February 16, 1973 Henson wrote Schaad as follows:

The Business Committee of the Ocean Grove Camp Meeting Association was impressed by your letter of January 15 in which you reviewed your method of newspaper delivery and the problems attendant thereto. They appreciated your clear and concise manner of presentation. Sunday morning service is, of course, a matter of concern and they will be grateful for an early completion of your Saturday nite route. * * *

The committee extends its good wishes for your success and urges you to continue the pattern which you have established.

---

[4]This provision as to adjustment is not an accurate indication of the impact that enforcement of the ordinance would have on Schaad. The record shows that his business would be destroyed.

The "business committee" apparently acts as an executive committee, representative of the trustees, who are vested with the responsibility of a governing body by the statute.

But it is not necessary to consider whether the Henson letter may be considered as the "written permission" contemplated in Ordinance 30, for soon thereafter the more comprehensive and restrictive Ordinance 73–2 was adopted, and it admitted of no exceptions. Later the instant complaints were filed against Schaad, and he brought this action to vindicate his right to continue the deliveries.

Our determination of this appeal will rest on our conclusion that the enforcement of Ocean Grove's regulations here in question, as applied to plaintiff's activities, constitutes an impermissible interference with freedom of the press. Certain additional facts, some of which are the subject of judicial notice, are relevant to that issue. Ocean Grove has an area of about a half square mile and is situated on the Atlantic Ocean adjacent to the resort community of Asbury Park. Ocean Grove itself is a summer resort, growing from an all-year population of about 7500 to about 18,000-20,000 in the summer. While newspapers are sold on Sundays in neighboring municipalities, and an affidavit offered on behalf of Ocean Grove expresses the opinion that the walk from any point in Ocean Grove to the nearest such [newspaper] outlet "does not exceed ten minutes", it is well known that a substantial proportion of the permanent residents are middle aged or elderly, and it is evident that many of them, especially in inclement weather, would probably find it difficult to obtain Sunday newspapers without such a home delivery service as plaintiff's.

## II

Plaintiff's initial contention is that the ordinances constitute an unreasonable interference with his right to conduct a lawful business, within such decisions as *N. J. Good Humor, Inc. v. Bradley Beach*, 124 *N. J. L.* 162 (E. & A. 1940), and *Iannella v. Piscataway Township*, 138 *N. J. Eq.*

598, 600 (Ch. 1946); and see *Schmidt v. Newark Bd. of Adjustment,* 9 *N. J.* 405, 415–416 (1952). The right to conduct a lawful business, however, is commonly held subject to reasonable police-power ordinances. Ordinarily, such powers extend to regulation of the use of the streets, *N. J. S. A.* 40:97–1, *Pivnick v. Newark,* 14 *N. J. Super.* 134, 137–138 (Law Div. 1951), and to proscribing certain Sunday activities. In the latter case such ordinances are upheld if they have the secular purpose and effect of protecting people from the burdens of work continued uninterruptedly for seven days or more. See *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199, 228 (1960); *Masters-Jersey, Inc. v. Paramus,* 32 *N. J.* 296, 302 (1960); *N. J. S. A.* 2A:171–5.8 *et seq.* Although the Sunday prohibitions in the instant ordinances are undoubtedly associated with the religious purposes which fostered the creation of the Ocean Grove Camp Meeting Association, etc. in 1870, the mere fact that a legitimate police-power policy (surcease from uninterrupted labor) coincides with the sectarian views of the association will not suffice to strike down the regulation on establishment-of-religion grounds. See *Two Guys from Harrison, Inc. v. Furman, supra* (32 *N. J.* at 214–216); *McGowan v. Maryland,* 366 *U. S.* 420, 433–434, 445, 81 *S. Ct.* 1101, 6 *L. Ed.* 2d 393 (1961).

Thus, were these regulations not voidable for undue interference with free circulation of the press, we might have difficulty in striking the regulations solely on due-process grounds of unreasonable interference with the conduct of a lawful business. In the circumstances, we need not pursue that question for purposes of decision of this case.

## III

The free press issue raised by plaintiff need not be examined in any broader context than the requirements of the case before us. Plaintiff does not seek the right to deliver papers during the daylight hours on Sunday, or later

than 2:30 A.M. on Sunday, and it would therefore be inappropriate here to explore the validity of Ocean Grove's regulations — in free press terms — in relation to the prohibition of Sunday newspaper deliveries beyond the early Sunday morning hours essential to plaintiff's operations. *Cf. State v. Zimmelman,* 62 *N. J.* 279, 287 (1973); *Camarco v. City of Orange,* 61 *N. J.* 463, 467 (1972). The question thus narrows to whether, according due deference to Ocean Grove's public-policy decision to forbid sale or distribution of newspapers insofar as the remainder of the 24 hours of the Sabbath is concerned, it is an undue restriction of the press to prohibit delivery of Sunday papers from midnight Saturday to 2:30 A.M. Sunday when the result is that those papers will probably not be delivered to homes in this community at all. We believe this question requires an affirmative response.

Ocean Grove argues that its ordinance is only an "incidental burdening of the press", assertedly permitted by *Branzburg v. Hayes,* 408 *U. S.* 665, 682–683, 92 *S. Ct.* 2646, 33 *L. Ed.* 2d 626 (1972), and that the comfort of the community requires the regulation of the time during which newspapers may be distributed. *Martin v. Struthers,* 319 *U. S.* 141, 143, 63 *S. Ct.* 862, 87 *L. Ed.* 1313 (1943).

The cited cases do not sustain this argument. First, the *Branzburg* case, which mentions "incidental burdening of the press", involved the claim of a First Amendment privilege by a newspaper reporter when ordered to testify before a grand jury. The reporter agreed not to divulge the names of persons interviewed in return for information but the grand jury demanded the names as well as information not appearing in the newspaper. In dealing with the reporter's claim that the press would be thwarted in its function of obtaining news on controversial topics if he and other reporters were forced to divulge such information before a grand jury, the court adverted to the "incidental burden" mentioned above. Clearly the total ban on the sale or

distribution of Sunday newspapers found in Ordinance 73–2 is more than an incidental burden.

Secondly, *Martin v. Struthers, supra*, dealt with a city ordinance prohibiting door-to-door solicitation or canvassing. The ordinance was held to be a violation of the First and Fourteenth Amendments. While the court did there state that the comfort of the community may require regulation of the time and manner of distribution of literature, 319 *U. S.* at 143, 63 *S. Ct.* 862, Ordinance 73–2, Section 1B, does not purport merely to regulate, but in effect prohibits sale and distribution of Sunday newspapers entirely. Moreover, plaintiff does not seek to solicit, canvass or knock on doors when he delivers his papers. The orders for the papers have already been placed and he is merely acceding to the desires of residents who have ordered the papers.

Since *In Matter of Jackson*, 96 *U. S.* 727, 733, 24 *L. Ed.* 877 (1878), it has been settled that "liberty of circulating is as essential to the freedom [press] as liberty of publishing; indeed without the circulation, the publication would be of little value." See also *Lovell v. Griffin*, 303 *U. S.* 444, 452, 58 *S. Ct.* 666, 82 *L. Ed.* 949 (1958). Thus an ordinance which, like Ordinance 73–2, Section 1B, prohibited the distribution of any literature, was struck down as unconstitutional. *Ibid.*

█ Freedom of the press is of course a fundamental personal right and liberty — one upon which the successful conduct of our democratic processes largely depends.

\* \* \* [A]ny attempt to restrict those liberties must be justified by clear public interest \* \* \*.

*Thomas v. Collins*, 323 *U. S.* 516, 530, 65 *S. Ct.* 315, 322, 89 *L. Ed.* 430 (1945). Moreover, where there is a charge of legislative abridgement of any of the First Amendment rights, courts are required to carefully "weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of

the rights." *Schneider v. Irvington,* 308 *U. S.* 147, 161, 60 *S. Ct.* 146, 151, 84 *L. Ed.* 155 (1939).

Accordingly, otherwise legitimate police power goals, such as Sunday rest and quietude and regulation of the use of the streets, "cannot be pursued by means that broadly stifle fundamental personal liberty when the end can be more narrowly achieved." *Cf. Shelton v. Tucker,* 364 *U. S.* 479, 488, 81 *S. Ct.* 247, 252, 5 *L. Ed.* 2d 231 (1960).

As was noted earlier, any disturbance of the peace and tranquility by plaintiff will be only to the extent of 2-1/2 hours every Sunday — midnight to 2:30 A.M. His customers order the papers he delivers; therefore there is no unwanted intrusion upon "their right to be let alone". *Rowan v. United States Post Office,* 397 *U. S.* 728, 736, 90 *S. Ct.* 1484, 1490, 25 *L. Ed.* 2d 736 (1970). The ordinance, drawn in terms of a complete prohibition, crosses the acceptable line of a reasonable "regulation of time, place and manner of distribution" *(Martin v. Struthers, supra,* 319 *U. S.* 141, 143, 63 *S. Ct.* 862, 863, 87 *L. Ed.* 1313), and becomes an unreasonable infringement upon plaintiff's First Amendment freedom of the press when compared to the "evil to be curbed". *Thomas v. Collins, supra* (323 *U. S.* 516, 530, 65 *S. Ct.* 1315, 89 *L. Ed.* 430).

In relation to the Sunday aspect of the present free press inhibition, the observations of another court may be peculiarly pertinent. In *Pulitzer Publishing Co. v. Mc-Nichols,* 181 *S. W.* 1, 2 (Mo. Sup. Ct. 1915), the court stated:

The great service the press is rendering to humanity is performed on Sunday as well as upon Monday or any other day of the week, and its beneficence is more potent on the former than on the latter, for the simple reason that the toiling masses have more time to read the papers on Sunday than upon any other day * * *.

We therefore hold Ordinance 73–2 invalid on free press grounds, but only to the extent of its prohibition of plaintiff's present deliveries by truck until 2:30 A.M. on Sundays.

By the same token, Ordinance 30, which prohibits the driving or parking of automobiles or other motor vehicles within Ocean Grove on Sunday, must, to the same limited extent, be deemed an invalid infringement of freedom of press.

## IV

The trial court chose to enjoin plaintiff's prosecution for violation of the ordinances on the premise not only of unconstitutional abridgement of plaintiff's rights to exercise freedom of the press, but also (1) on the ground that total prohibition of driving of vehicles on Sunday is invalid "as an overly broad exercise of the police power" and (2) on the sweeping ruling that *N. J. S. A.* 40:97-1 *et seq.*, the statutory grant of power to camp meeting associations formed to provide meeting grounds for religious purposes, to adopt police-power ordinances, was violative of the establishment-of-religion clause of the First Amendment of the United States Constitution.

■ As to the first added ground of decision mentioned, we regard that holding as unnecessary and inappropriate in this case. Plaintiff does not seek to drive his vehicle on Sundays except to the limited extent already indicated. Relief is amply afforded him by an order that he may drive his vehicle for purposes of distribution of papers from midnight to 2:30 A.M. on Sunday. The validity of the ordinance in its more expansive aspect may be determined if it is enforced against one driving at other times on a Sunday and such enforcement is challenged.

■ The observations in the prior paragraph might ordinarily also be applicable to the trial court's invalidation of the statutes vesting limited municipal powers in camp meeting associations on constitutional-religious grounds. It is so obvious as not to require citations that an appellate court need not decide a case on every ground advanced by the successful litigant or held by the trial court, when less will sustain the judgment. A special application of this principle is the so-called "rule of necessity", *i. e.*,

that the resolution of controversies on constitutional grounds is to be avoided where possible. See generally Barnett, "Avoidance Of Judicial Decision Upon Constitutional Ground When Decision Can Be Based Upon Another Ground", 28 *Ore. L. Rev.* 201 (1949); Note, "Avoidance of Constitutional Issues in Civil Rights Cases", 48 *Colum. L. Rev.* 427 (1948). And see *Ashwander v. Tennessee Valley Authority,* 297 *U. S.* 288, 347, 56 *S. Ct.* 466, 80 *L. Ed.* 688 (1936). The rule received early expression in an opinion by Chief Justice Marshall while he was sitting on the circuit bench:

No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires that the obligations of its laws should not be unnecessarily and wantonly assailed. *Ex parte Randolph*, 20 *F. Cas.* pp. 242, 254 (No. 11,558) (C. C. D. Va. 1833).

It seems to us, by analogy to the foregoing rule of necessity, that where there is more than one potential constitutional basis for invalidation of a restriction based upon a statute and a dependent ordinance, as here, a court should, ordinarily, lean toward that *ratio decidendi* in judgment which will save as much of the statute and ordinance or of the range of their application, as possible, and rest its invalidation thereof on the narrowest basis consistent with relief to the successful suitor. Such a principle of judicial deference to legislation would have been particularly apropos here when the extraneous issue entertained by the trial court involved the total destruction of a community's statutory governing powers continuously exercised and dating back, in part, over a century.

Although, therefore, we think it was a mistaken exercise of judical discretion for the trial court to have entered upon the religious issue in this particular case, we have decided to deal with it on its merits for two reasons. First, three partially dissenting members of this

Court have chosen to express their earnestly held view that the statutes are indeed invalid on establishment grounds. Second, a published decision of a county court has, since the pendency of this appeal, purported to invalidate the municipal court of Ocean Grove on the same broad grounds.[5]

It therefore impresses us as in the general interest, in these peculiar circumstances, for us to lay to rest this question of considerable public importance notwithstanding the fact that our affirmance of the relief awarded plaintiff below on free-press grounds would have rendered it unnecessary.

We accept the premise of the trial court that the criteria for validity set forth in *Lemon v. Kurtzman,* 403 *U. S.* 602, 612–613, 91 *S. Ct.* 2105, 2111, 29 *L. Ed.* 2d 745 (1971), are those to be applied here to determine whether the Ocean Grove enabling legislation is consistent with the Establishment clause:

> Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, * * *; finally, the statute must not foster "an excessive government entanglement with religion."

However, the underlying decisions of the United States Supreme Court from which *Lemon* has distilled the three criteria stated in the foregoing excerpt make it plain that careful and detailed analysis and weighing of the factual circumstances in which the questioned legislation arose and

---

[5]*State v. Celmer*, 143 *N. J. Super.* 371 (Cty. Ct. 1976). We here take no position on the strict holding in *Celmer* that the legislative vesting of power to establish a municipal court in camp meeting associations of religious origin is in violation of the Establishment clause. Such a power was not contained in the 19th century police power legislation under scrutiny here but was granted by the amendment of *N. J. S. A.* 40:97-4 contained in *P. L.* 1953, *c.* 37, § 274. The power to create a court, granted by this latter-day amendment, may well be distinguishable from the subject matter of the original legislation in the light of the rationale, developed later herein, for sustaining the validity of the earlier statutes.

now operates is requisite for a proper adjudication as to validity. We discern the ultimate benchmark to be whether the legislation impermissibly fosters religion rather than serves secular purposes with only incidental relation to religion or religious interests or organizations. *Cf.* Giannella, "Religious Liberty, Nonestablishment, and Doctrinal Development: Part II. The Nonestablishment Principle", 81 *Harv. L. Rev.* 513, 515, 517–518, 532–533 (1968). The opinion of the trial court in respect of this issue is obviously lacking in such factual analysis addressed to the *Lemon* criteria.

█ The first two of the *Lemon* criteria quoted above can be conveniently dealt with together. They will be seen from the discussion hereinafter obviously not to be offended by the legislation under examination. We shall scrutinize that legislation presently. Examined in the light of the history of the birth and early development of Ocean Grove, it will be evident that the statutes had the "secular legislative purpose" of giving the governing body of the camp meeting association the authority to adopt regulations for the good order, proper physical development and general health and welfare of the new community. These purposes are not a whit less secular in nature than if they had been given to a conventional municipal governing body. By the same token, the "principal or primary effect" of the enabling legislation will be found to be parallel to its "secular purpose". The powers given, as will be observed, were the rudimentary police powers which any community had to be vouchsafed, especially a new one in an isolated area sprung up from unimproved lands in the 1870's, to prevent disorder, lay out streets, provide for sewage and other health facilities, regulate and license tradesmen, etc. None of these powers, as enumerated in the enabling legislation, had or have *any* effect toward advancing or inhibiting religion, much less a "principal or primary effect" in either of those directions.

Chief Justice Burger in the establishment case of *Walz v. Tax Commission,* 397 *U. S.* 664, 675–676, 90 *S. Ct.* 1409, 25 *L. Ed.* 2d 697 (1970) (validity of tax exemption of church property), aptly quoted the noted dictum of Justice Holmes in *New York Trust Co. v. Eisner,* 256 *U. S.* 345, 349, 41 *S. Ct.* 506, 507, 65 *L. Ed.* 963 (1921), that "a page of history is worth a volume of logic". So, indeed, here.

In 1869 a small band of Methodist clergymen headed by Rev. William B. Osborn of Farmingdale capped a long search for an agreeable place to establish camp meeting grounds near the ocean by choosing the 260 acres which is now the nucleus of Ocean Grove.[6] The site was then mainly sand dunes and a grove of trees, and only one family of four people lived there. Gibbons, *History of Ocean Grove* (1939), 9–11. The property was purchased and the project quickly attracted adherents. The organizers were incorporated by a charter, *L.* 1870, *c.* 157, as the Ocean Grove Camp Meeting Association of the Methodist Episcopal Church. To maintain the special character of the place the association adopted the policy of retaining title to all the lands, streets, walks, parks and public places and public buildings. Residents, many originally living in tents (there are still some tent dwellers) and only for a part of the summer, were sold leaseholds for 99 years, renewable in perpetuity, at a fixed sum down and a stated annual ground rental. See *Ocean Grove Asso. v. Sanders,* 68 *N. J. L.* 631 (Sup. Ct. 1903) ; *Ocean Grove Camp Meeting v. Reeves,* 79 *N. J. L.* 334 (Sup. Ct. 1910), aff'd 80 *N. J. L.* 464 (E. & A. 1911).

---

[6]Camp meetings have been described as revivals of the ancient Hebrew practice of the Feast of Tabernacles or Succoth, named for the first camping grounds of the Israelites after leaving Rameses in their departure from Egypt. Brewer and McMahon, *Perspectives on Ocean Grove 1869–1969* (1969) 4. The first camp meetings in America were held in 1799 in Kentucky. They have been scattered throughout the United States and England during the intervening period, principally in the nineteenth century. *Ibid.*

The physical development and population growth of Ocean Grove was relatively rapid and contrasted with the undeveloped or sparsely inhabited character of much of the territory in close proximity with it. Gibbons, *op. cit. supra*, p. 9. In these circumstances, with no existing local governmental structure available, it was not surprising that the Legislature should grant basic rudimentary police and governmental powers to the Trustees of the new Camp Meeting Association for the governance of their new community.[7] The 1870 charter created the association a "body, corporate and politic". Section 3 gave the Trustees power to construct and provide all necessary works to supply the said premises with "water and artificial light and to provide all other conveniences and make all other improvements which might be decmed necessary or desirable". Section 4 created a governing body of 26 Trustees and provided for officers to be selected from among them. Section 5 granted power to pass and enforce such by-laws as might be needed, not repugnant to the constitutions and laws of the State or the United States. Section 7 accorded the authority to appoint such peace officers as should be deemed necessary for the purpose of keeping order on the camp grounds and premises of the corporation; which officers would possess the same power and authority which constables and other peace officers possessed, particularly the power "to enforce obedience on said grounds and premises to any rule or regulation of said Trustees for the preservation of quiet and good order."

In the succeeding decade a series of legislative enactments was passed expanding the powers of camp meeting

[7]Other Methodist camp meeting associations were incorporated during the same period, and were granted similar limited governmental powers. At least one which still survives was incorporated as the Camp Meeting Association of the Newark Conference of the Methodist Episcopal Church. *L.* 1869, *c.* 185, p. 484, and maintains a community called Mount Tabor in Morris County.

associations and seaside resorts (not qualified by the religious character of the organizations). *L.* 1878, p. 45 (C. S. 355) dealt with sewerage and drainage works; *L.* 1878, p. 133 (C. S. 358) with the licensing of boats, trucks and commercial vehicles of all kinds; and *L.* 1881, *p.* 270 (C. S. 358) with the licensing, regulating and restraint of sale of liquors.

The former rudimentary and basic powers were consolidated and expanded in 1894 into a general police power statute applicable to "any camp meeting association or other corporation heretofore or hereafter incorporated under the laws of this state for the purpose of providing any religious body or society with a permanent camp· meeting ground or place for religious service * * *". *L.* 1894, *c.* 90 (*N. J. S. A.* 40:97–1 *et seq.*). It is not necessary here to detail all the regulatory and police powers specified in the nine sections of the statute. They are generally those essential to the maintenance of good order, health and welfare of a small municipality and specifically included the authority to regulate the use of streets under which the ordinances in contention in this case were adopted ("to prescribe and fix the terms, times and manner in which such streets * * * may be used * * *" Section 1.).

It should be emphasized at this point that what is at issue here is the validity in establishment terms of *the structure of local government* outlined above, not the matter of validity, in establishment or other terms, of any particular regulation adopted by that government such as the Sunday closing law which gave rise to this controversy.[8] If any particular ordinance or regulation adopted by the

---

[8]As noted above, Sunday closing laws or ordinances are defensible in establishment terms even where of religious origin; see *McGowan v. Maryland, supra* (366 *U. S.* 420, 81 *S. Ct.* 1101, 6 *L. Ed.* 2d 393) ; *Two Guys from Harrison, Inc. v. Furman, supra* (32 *N. J.* 199, 214–216). The discussion of such cases is relevant to the establishment issue in this case, and is pursued more fully *infra.*

Ocean Grove trustees is invalid for any reason, relief should be had by exscinding the regulation, not striking down the whole structure of local government if otherwise valid.

Relevant to the *Lemon* criteria as to whether the governmental scheme described above had a "secular" legislative purpose and not a "primary or principal effect" which "advances religion" is the geographical and sociological setting of a community likely in the latter part of the 19th century to be a religious camp meeting association. Plainly such a congregation would be settled over a large area of land, housing hundreds or thousands of people for weeks or months at a time. The logistic and order-maintenance requirements of such a community would be apt to be peculiar to itself, not shared by a larger area having nothing in common with it but territorial contiguity.

This quality of uniqueness of requirements is exemplified by Ocean Grove itself. This enclave of about one-half square mile is surrounded on three sides by water; the ocean on the east, and Fletcher and Wesley lakes on the south and north. There is no through road traversing the area. The nearest inter-municipal road is Route 71 (Main Street) in Neptune Township, skirting Ocean Grove on the west. The occupants of all the lots of land, moreover, are lessees or the heirs or assignees of lessees who acquired their interests under agreements to abide by the rules of the association. There is no indication of any complaint by any resident at any time over the regulatory character of the community.[9]

---

[9]Although an internal movement to change the form of government to a borough resulted in a statute to that effect, L. 1920, c. 96, the act preserved the Sunday closing features of the regulatory scheme The statute was held invalid as special municipal legislation. *McCran v. Ocean Grove*, 96 *N. J. L.* 158 (E. & A. 1921). The community has operated ever since under the prior legislation.

Under its distinct form of government and the customs and traditions which have grown up in the course of a century there has developed in Ocean Grove a unique way of life within a spiritual and cultural enclave which has been resorted to by many thousands of people over the generations. Ocean Grove's repute in this regard

Ocean Grove being thus geographically tucked away from bordering Neptune Township as a whole, having had a separate and distinct community development, see *supra,* and the entirety of the land being owned by the camp meeting association and devoted exclusively to the purposes of its adherents, it was *functionally* appropriate in a purely secular sense to vest primary police powers in the association.

Thus viewed, the secular purpose of the Legislature in conferring upon associations of this nature the powers in question, at least in application to Ocean Grove, would appear beyond question.

There should be no greater difficulty in refuting any notion that the legislation's *primary or principal effect* was to advance religion. It is obvious that the primary effect was to create a mechanism for basic local regulation of the community. How the streets were to be laid out, how sewers were to be created, how merchants were to be licensed, how order was to be maintained, were all of no consequence in a religious sense. The advancement of the religion of the residents of Ocean Grove was a product of their mutual devotion to their beliefs, not a function of the kind of police powers the Legislature saw fit to repose in the board of trustees. What incidental benefit the camp meeting association derived therefrom in its religious aspect, if any, was permissibly incidental to the secular purpose of the legislation. As the United States Supreme Court has recently stated: "Neutrality is what is required. The State must confine itself to secular objectives, and neither advance

is nationwide. The New Jersey Department of Environmental Protection is planning to nominate Ocean Grove to the National Register of Historic Places. Speakers at the Ocean Grove Auditorium have included Presidents Grant, Garfield, McKinley, Theodore Roosevelt, Taft and Wilson and many other distinguished persons. Gibbons, *op. cit. supra,* at 54–57. Performing artists like Mme. Galli-Curci, Enrico Caruso, Walter Damrosch, Mme. Schumann-Heink, Emma Eames, Arthur Pryor, Louise Homer, David Bispham, Alma Gluck, Albert Spalding, Fritz Kreisler and Mischa Elman were all heard there. Brewer and McMahon, *op. cit. supra,* at 27–28.

nor impede religious activity". *Roemer v. Maryland Public Works Bd.,* 426 *U. S.* 736, 747, 96 *S. Ct.* 2337, 2345, 49 *L. Ed.* 2d 179, 188 (1976). In further explication, however, the court said: "* * * Everson [*Everson v. Board of Education,* 330 *U. S.* 1, 67 *S. Ct.* 504, 91 *L. Ed.* 711 (1947)] and Allen [*Board of Education v. Allen,* 392 *U. S.* 236, 88 *S. Ct.* 1923, 20 *L. Ed.* 2d 1060 (1968)] put to rest any argument that the State may never act in such a way that has the *incidental* effect of facilitating religious activity". (emphasis added). *Roemer, supra,* 426 *U. S.* at 747, 96 *S. Ct.* at 2345, 49 *L. Ed.* 2d at 188. *Everson* held valid a state program for compensating parents of children for bus transportation to school, including to parochial schools. *Allen* validated the loan of secular text-books by the State on equal terms to public and church-related elementary schools.

The conclusion of the trial court herein that the statutes in question "were specifically enacted in order to advance religion" is based upon a transparent non-sequitur. The court said that *because* the associations and corporations given the police powers were described in the statute as those *incorporated* "for the purpose of providing any religious body or society with a permanent camp meeting ground or place for religious service", *N. J. S. A.* 40:97–1, *therefore* the vesting in them of police power regulations was for the purpose of advancing religion. This of course ignores the secular nature of the powers conferred and the manifold secular operations of such land-owning societies for the facilitation of which the powers were conferred. As well might one aver that the broad spectrum of legislation collected under Revised Statutes Title 16, "Corporations and Associations, Religious", regulating every aspect of the incorporation, governance, and control of properties of religious organizations, and dealing separately with many specific churches by name, *e. g., N. J. S. A.* 16:2–1 *et seq.* (Baptist and Seventh-Day Baptist Churches) ; *N. J. S. A.* 16:3–1 *et seq.* (Church of Christ, Scientist): *N. J. S. A.* 16:5–1 (Evangelical Lutheran

Church); *N. J. S. A.* 16:6–3 etc. (Free Methodist Church), constitutes a series of violations of the Establishment clause because having the purpose of advancing the interests of those churches.[10]

The case perhaps most relevant to the contention that the statutes here involved have an invidious primary effect of advancing religion is *McGowan v. Maryland, supra* (366 *U. S.* 420, 81 *S. Ct.* 1101, 6 *L. Ed.* 2d 393). In that case employees of a department store who were convicted of selling articles on Sunday in violation of Maryland statutes prohibiting such activity on Sunday contended that the Sunday closing laws of that state were clearly of religious origin and that their enforcement against them violated the Establishment clause. The court conceded that there was much evidence of religious inspiration and purpose in the inception of the legislation, not only in Maryland but throughout the American colonies, 366 *U. S.* at 431–433, 81 *S. Ct.* 1101. But it demonstrated that in modern times such legislation came to enjoy the widespread approbation of the public for its

---

[10]The concurrence and dissent of Justice Pashman goes beyond any contention of appellant to single out the religious qualifications for office of a trustee in the camp meeting association charter as demonstrating a violation of the Establishment clause, citing *Torcaso v. Watkins*, 367 *U. S.* 488, 81 *S. Ct.* 1680, 6 *L. Ed.* 2d 982 (1961) (p. 280). However, *Torcaso*, properly read, held the imposition of a religious oath requirement for the office of notary public violated the Free Exercise of Religion clause, not the Establishment clause. See 367 *U. S.* at 496, 81 *S. Ct.* 1680. It also noted that an oath test for office violates Article 6 of the federal constitution. 367 *U. S.* at 491, 81 *S. Ct.* 1680. No one in the present case complains, as did *Torcaso,* that he is being denied office because of his religious beliefs. Plaintiff obviously would have no standing to make such a claim.

Moreover, this tack of the dissent is irrelevant to the question of the validity of the basic statutes here involved, *N. J. S. A.* 40:97–1 *et seq.* Nowhere does this legislation impose religious or other qualifications for officers of trustees of the kind of camp meeting associations designated therein. Bylaws and ordinances have the force of law "when not inconsistent with the constitution and laws of this state." *N. J. S. A.* 40:97–6.

quality of affording society a secular benefit — that of "making Sunday a day of rest, a day when people may recover from the labors of the week just passed and may physically and mentally prepare for the week's work to come." 366 *U. S.* at 434, 81 *S. Ct.* at 1110. The court rationalized its validation of the statutes as follows:

The present purpose and effect of most of them is to provide a uniform day of rest for all citizens; the fact that this day is Sunday, a day of particular significance for the dominant Christian sects, does not bar the State from achieving its secular goals. To say that the States cannot prescribe Sunday as a day of rest for these purposes solely because centuries ago such laws had their genesis in religion would give a constitutional interpretation of hostility to the public welfare rather than one of mere separation of church and State. 366 *U. S.* at 445, 81 *S. Ct.* at 1115.

In concurring in that case Justice Frankfurter observed that the fact that the legislators' purposes were religious was irrelevant. 366 *U. S.* at 468–469, 81 *S. Ct.* 1101. He said, moreover, that "not every regulation some of whose practical effects may facilitate the observance of a religion by its adherents affronts the requirement of church-state separation." 366 *U. S.* at 467, 81 *S. Ct.* at 1157.

This court has upheld Sunday closing laws essentially on the *McGowan* rationale of secularity although in a decision preceding that case. *Two Guys from Harrison, Inc. v. Furman, supra,* 32 *N. J.* at 215–216.

In terms of the judicial weighing, required by the foregoing authorities, of legislative intent and effect which is seen to be implicit in the process of deciding whether a benefit to religion is only the incidental rather than the primary or principal effect of a statute which has secular objectives, we consider the settled validity of Sunday closing laws to constitute *a fortiori* support for the validity of the instant legislation. Even the courts validating the Sunday laws concede that they are widely regarded as facilitating Sunday worship and religious cessation of labor and that they substantially further such ends. See *McGowan, supra,*

*passim*. The instant statutes, whose plain purpose and effect are to regulate the general health, safety and welfare of the camp meeting association and its tenants, have, to the contrary, only the remotest functional connection, if any, with religion. They are peculiarly within the rationale stated by Justice Frankfurter, concurring in *McGowan*: "* * * once it is determined that a challenged statute is supportable as implementing other substantial interests than the promotion of belief, the guarantee prohibiting religious 'establishment' is satisfied." 366 *U. S.* at 466, 81 *S. Ct.* at 1157.

See also *Walz v. Tax Commission, supra* (397 *U. S.* 664, 90 *S. Ct.* 1409, 25 *L. Ed.* 2d 697), which sustained the universal practice of property tax exemption for churches as not violative of the Establishment clause, notwithstanding its obvious and major characteristic of financial support of religion by government.

We now pass to consideration of the third of the three *Lemon* criteria: whether the questioned legislation fosters "an excessive government entanglement with religion". 403 *U. S.* at 612–613, 91 *S. Ct.* at 2111. We believe it clearly does not. The very formulation of the criterion renders it obvious that the Supreme Court does not regard mere "entanglement" of government with religion, given compliance with the first two *Lemon* criteria, as fatal so long as the entanglement is not "excessive".

The entanglement test first surfaced in Chief Justice Burger's opinion in *Walz v. Tax Commission, supra*. The court said:

Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry, however. We must also be sure that the end result — the effect — is not an *excessive* government entanglement with religion. The test is inescapably one of degree. (emphasis added). 397 *U. S.* at 674, 90 *S. Ct.* at 1414.

As thus stated, the criterion hardly seems to differ from the second, *i. e.*, that the principal or primary effect not be to advance or inhibit religion. Indeed, Justices White

and Rehnquist regard the entanglement criterion as serving no legitimate purpose. *Roemer v. Maryland Public Works Bd., supra,* 426 *U. S.* at 767–770, 96 *S. Ct.* at 2355–2356, 49 *L. Ed.* 2d at 200–201. In any event, the discussions of that criterion in both *Walz* and *Lemon* appear to suggest that it comes into play if the questioned statute involves or requires substantial government surveillance of a religious institution, particularly of a continuous nature, *Lemon,* 403 *U. S.* at 615, 617, 619–620; 91 *S. Ct.* 2105; *Roemer, supra,* 426 *U. S.* at 761–767, 96 *S. Ct.* at 2352–2354, 49 *L. Ed.* 2d at 196–199. Another earmark of excessive entanglement is the tendency of the State activity toward a "divisive political potential", *Lemon,* 403 *U. S.* at 622; 91 *S. Ct.* 2105; *Roemer,* 426 *U. S.* at 765, 96 *S. Ct.* at 2353, 49 *L. Ed.* 2d at 198. In this regard the inquiry is whether the State activity creates a "danger of '[p]olitical fragmentation * * * on religious lines'". *Id.,* 426 *U. S.* at 765, 96 *S. Ct.* at 2523, 49 *L. Ed.* 2d at 198.

So far as the discussion in the cases cited affords any insight as to what is meant by "excessive entanglement", none appears to be present in the case at hand. No surveillance of any nature is required by the State in respect of the powers granted the camp meeting association — certainly no administrative surveillance of any phase of its religious activities — as was found to be the case in *Lemon.* Nor has the grant of limited regulatory powers to camp meeting associations been attended by any degree of political "divisiveness" or "fragmentation" along political lines. We are not aware that the governmental powers of Ocean Grove have ever been the subject of political or partisan conflicts along religious lines.[11] To the contrary, the administration of the community seems to have been attended at all times by general public acceptance, serenity, and even admiration

---

[11]The local dispute over form of government in 1920 was not in reference to religious issues. See note 9, *supra,* and Justice Pashman's concurring and dissenting opinion (pp. 283–285).

by the people of the County of Monmouth and the State as a whole. As noted above, the New Jersey Department of Environmental Protection is planning to nominate Ocean Grove to the National Register of Historic Places.

In sum, there is no factual basis for the trial court determination that the statutes before us foster excessive entanglement of the State with religion — certainly not in any sense explicated by the decisions of the United States Supreme Court in reference to that concept discussed above.

We are, of course, not unaware that there may appear to be something anomalous in the vesting of even limited governmental powers in a private organization, whether religious or otherwise. But there have been analogous instances of it. In *Humane Soc. of U. S. v. N. J. State Fish and Game Coun.*, 70 *N. J.* 565 (1976), the court sustained as against challenges on equal protection and due process grounds legislation which excludes from appointment to the Fish and Game Council any person not recommended by either the State Agricultural Convention or the New Jersey State Federation of Sportsmen's Clubs. We there said that "Even delegation of legislative authority to private parties may withstand constitutional challenge if sufficient safeguards exist to prevent an arbitrary concentration of power in persons or groups motivated by self-interest." 70 *N. J.* at 579.

We do not here undertake to express a settled view as to the validity of the statutory scheme before us on aspects other than violation of the Establishment clause, as only that is embraced by the trial court and argued by plaintiff on this phase of the appeal. We only observe that there is no *patent* offensiveness on other constitutional grounds which should move us, on our own motion, and without argument, to strike down Ocean Grove's statutory form of government.

The trial court rejected plaintiff's contention that these statutes constitute invalid special legislation, and plaintiff does not renew that argument before us. It may be pointed out that this and various other alleged defects in these stat-

utes, including that they "attach a religious test to municipal franchises", were rejected summarily by the former Court of Errors and Appeals in *Percello v. Ocean Grove Camp Meeting Asso.*, 2 *N. J. Misc.* 124 (Sup. Ct.), aff'd o. b. in 100 *N. J. L.* 407 (E. & A. 1924).

A transcending consideration in passing upon the validity of this century-old governmental scheme, which survives today in this State, so far as we are aware, in only this and the camp meeting association at Mount Tabor,[12] is that of the presumption of validity of a long-existent legislative plan or arrangement. In *In re Loch Arbour*, 25 *N. J.* 258 (1957), there was a charge that the State, through its requirement that villages that wished to incorporate hold a special election for that purpose, was unconstitutionally attempting to regulate the internal affairs of a municipality. This court upheld the validity of the legislation and noted, 25 *N. J.* at 264–265:

> In approaching a problem such as this, courts always recognize a strong presumption of constitutionality; doubts are resolved in favor of conformity with the organic law, and if the statute under attack admits of two constructions, one of which will render it invalid and the other valid, the interpretation sustaining constitutionality will be adopted. Added force is given to these basic concepts by the further policy of our law *not to invalidate a statute which has been in force without substantial challenge for many years, unless its unconstitutionality is obvious. Brown's Estate v. Town of Union*, 62 *N. J. L.* 142 (Sup. Ct. 1898); *O'Banner v. Pendlebury*, 107 *N. J. L.* 245, 247 (E. & A. 1931); *Gibraltar Factors Corp. v. Slapo*, 23 *N. J.* 459, 463 (1957).                    (emphasis added).

This view was restated in *State v. Joas*, 34 *N. J.* 179, 186–187 (1961), and is fundamental to our jurisprudence.

In particular application to long acquiescence as supporting a governmental practice against an establishment attack, Chief Justice Burger, in *Walz v. Tax Commission, supra,* noted the age-old acceptance of exemption of church

[12]Noted in note 7, *supra.*

property from taxation as proper. 397 *U. S.* at 678, 90 *S. Ct.* 1404. He then aptly quoted Justice Holmes' dictum in *Jackman v. Rosenbaum Co.,* 260 *U. S.* 22, 31, 43 *S. Ct.* 9, 67 *L. Ed.* 107 (1922), "If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." 397 *U. S.* at 678, 90 *S. Ct.* at 1416.

The presumption of validity of the camp meeting association legislation from a constitutional-religious standpoint, arising from long public acceptance and acquiescence therein, should not be affected by any supposition that our State constitutional interdictions against religious preferences are narrower than the federal Establishment clause. In this regard, note should be taken of the opinion in *Clayton v. Kervick,* 56 *N. J.* 523 (1950). That case, in purporting to contrast the State and federal constitutional provisions as to religion, mentioned only Art. I, sec. 4 of the 1947 Constitution, prohibiting the establishment of one religious sect in preference to another and any religious test as a qualification for public office. *Id.* at 528. However, section 3 of the same article preserves the individual right of freedom of worship and of immunity from attending or supporting any place of worship or ministry. These sections were substantially the same as the corresponding provisions of the Constitution of 1844 and of Article 18 of the Constitution of 1776. In our judgment, the letter and spirit of these New Jersey constitutional provisions, taken together, are substantially of the same purpose, intent and effect as the religious guaranties of the First Amendment and have probably always been regarded as such in this State. See *Everson v. Board of Education of Ewing Twp.,* 133 *N. J. L.* 350, 351, 366–367 (E. & A. 1945), aff'd 330 *U. S.* 1, 67 *S. Ct.* 504, 91 *L. Ed.* 711 (1947); *cf. Tudor v. Board of Education of Rutherford,* 14 *N. J.* 31, 44–45 (1953), *cert.* den. *sub nom. Gideons Internat'l v. Tudor,* 348 *U. S.* 816, 75 *S. Ct.* 25, 99 *L. Ed.* 644 (1954). And compare our two constitutional provisos on religion with

the summary of the intent and purpose of the Establishment clause set forth in *Everson v. Board of Education, supra* (330 *U. S.* at 15–16, 67 *S. Ct.* 504).

Thus, notwithstanding the fact that the Establishment clause has been regarded as binding upon the States, *via* the Fourteenth Amendment, only since the 1940 decision of *Cantwell v. Connecticut,* 310 *U. S.* 296, 60 *S. Ct.* 900, 84 *L. Ed.* 1213, the failure of anyone in this State before *Percello v. Ocean Grove Camp Meeting Association, supra,* to raise a religious issue concerning the validity of the instant legislation, under either the State or the federal Constitution, or of anyone since *Percello* to do so, warrants the invocation of the strong presumption of its validity in the respect here debated.

In *Percello, supra,* there was a broadside attack upon the statutory regulatory powers of the Ocean Grove Camp Meeting Association which was described in the former Supreme Court's opinion as follows (2 *N. J. Misc.* at 125) :

That the statute is unconstitutional as a special law respecting the internal affairs of Neptune township, and as also granting to the camp meeting association, as a private corporation, certain exclusive privileges; that it is, in effect, a delegation of police powers to a private association; *that it purports to attach a religious test to municipal franchises;* that the classification of camp meeting associations is illusory. Other reasons assigned are that the original charter of the association in 1870 conferred no licensing powers; that the township of Neptune has exclusive powers; that two municipal corporations cannot occupy the same space at the same time; that the territory called Ocean Grove was never incorporated; that the charter of 1870 was repealed in 1879, and that any attempt to restrict the municipal powers of the township of Neptune is unconstitutional and void.                                          (emphasis added).

The court summarized these objections as being, basically, "that camp meeting associations are not a legitimate class of municipalities with respect to which legislation purporting to be general municipal legislation can be enacted." 2 *N. J. Misc.* at 125–126. The court then dealt with the argument as follows (2 *N. J. Misc.* at 126–127) :

If this be so, it seems strange that the invalidity and unconstitutionality of legislation affecting camp meeting associations as a class have not been discovered before. They have been treated by the legislature as a class in municipal legislation for many years, in fact, since just after the constitution of 1875. *Comp. Stat.*, p. 354, etc. In 1878 there was an act giving license powers to camp meeting associations (*Comp. Stat.*, p. 358), including hucksters and peddlers of merchandise and provisions. This act was attacked in the case of *Grover v. Ocean Grove Camp Meeting Association*, 45 *N. J. L.* 399, but it is noticeable that the attack was not based on any question of special legislation and went solely to the powers contained in the body of the act in relation to liquor licenses, and this on the ground that the title of the act did not cover that point; and this was what the court decided. Later, in 1887, came an act with regard to licensing of vehicles in camp meeting associations. *Comp. Stat.*, p. 362. In 1894 there was enacted another act, conferring certain powers of government on the managers of camp meeting associations, by section 8 of which (*Comp. Stat.*, p. 365) it is provided that every such board of trustees, directors or managers shall have full power and authority to make, establish and enforce ordinances regulating the granting of all licenses and fixing the fees to be paid therefor which, by any laws of this state now in force or hereafter passed, they may have authority to grant, and to fix and prescribe penalties for the violation of such ordinances, &c. This act was considered by this court in the case of *Slocum v. Camp Meeting Association*, 59 *N. J. L.* 110; and, again, it is noticeable that the question discussed and substantially the only question was whether the association could delegate to a magistrate the power to fix a fine for the infraction of an ordinance requiring a license to sell fruit. There seems to have been no hint on the part of either counsel or the court that the statute itself was an infraction of the constitution.

So far as relates to the status of Ocean Grove as a municipal corporation, we need go no further than to quote the language of the present Chief Justice in *McCran v. Ocean Grove*, 96 *N. J. L.* 161, where it was said that that corporation by its charter was constituted a body corporate and politic.

As an abstract proposition we think there is little or no merit in the attack on the constitutional status of the act now under consideration. But even if we were inclined to think it somewhat vulnerable in that regard, the existence of other acts in *pari materia*, unchanged for a period of nearly fifty years, should clearly turn the scale in favor of its support. *Butler v. Commonwealth Tobacco Company*, 74 *N. J. Eq.* 423; *Commonwealth Roofing Company v. Riccio*, 81 *N. J. Eq.* 486, 489, and cases cited.

The foregoing excerpt is set out at length not to refute the merits *per se* of the trial court opinion in respect of alleged violation of the Establishment clause, since we

realize that the only religious question raised by the plaintiff in *Percello* was the narrow one of a "religious test to municipal franchises". But the *Percello* court's general approach to the effect of 50 years of acceptance by the bench, the bar and the public as fostering a presumption of validity of the legislation attacked both there and here is now fortified by the passage of yet another 50 years without challenge of the legislation on establishment or any other grounds since *Percello*.

For the reasons stated we conclude that a sound presumption of validity undergirds our independent determination from the facts and the principles of constitutional law explicated by the highest court of the land that Ocean Grove's statutory police powers, exercised by adoption of the ordinances involved in this case, do not offend the Establishment clause of the First Amendment.

There is no apparent likelihood that the occasion for further such legislation, or for the application of the existing legislation to new camp meeting associations, will arise in the future. This association and community are practically unique in today's society, and the case before us is truly *sui generis*. In the *Walz* case, *supra,* the court referred to the "eminently sensible and realistic application of the language of the Establishment Clause" in the *Everson* case, *supra,* where state aid for the transportation of parochial school pupils was upheld. 397 *U. S.* at 671, 90 *S. Ct.* at 1412. So here, too, viewed sensibly and realistically, the government of this community presents no threat whatsoever to the constitutional and salutary principle of government abstention from sponsorship or support of religion.

The judgment of the Law Division is modified and the cause is remanded for entry of a modified judgment, with appropriate restraints against defendants, declaring that on grounds of undue interference with a free press defendants may not enforce either Ordinance 30 or Ordinance 73–2 in respect of plaintiff's activity in delivering newspapers by

truck in Ocean Grove from Saturday midnight to 2:30 A.M. Sunday.

No costs.

SULLIVAN, J., concurring in result only. I agree that Ocean Grove's attempted restrictions on the Sunday delivery of newspapers infringe on the freedom of the press and that the "ordinances" in question, even if otherwise lawful, are invalid for that reason. However, I am unable to subscribe to the majority's sympathetic holding that "the government of this community presents no threat whatsoever to the constitutional and salutary principle of government abstention from sponsorship or support of religion."

Camp meeting associations exist for the purpose of providing religious bodies or societies with camp meeting grounds or places for religious services. The statute in question, *N. J. S. A.* 40:97–1 *et seq.*, and other ancillary laws, confer on a Camp Meeting Association the power, within the limits of lands owned or controlled, to enact ordinances and impose penalties for violation thereof, to establish municipal courts (*N. J. S. A.* 40:97–4), to have licensing and regulatory power (*N. J. S. A.* 40:95–1 *et seq.*), to plan for sewerage and drainage facilities and impose assessments for such improvements, which assessments become liens on the lands affected, *N. J. S. A.* 40:96–1 *et seq.* Its peace officers not only have the power, on camp grounds, to enforce association rules and regulations for the preservation of quiet and good order, but also can arrest for the commission of any crime in all respects. *N. J. S. A.* 40:99–1.

Camp meeting associations also are constituted fire districts, the duly elected commissioners of which are empowered to issue bonds to finance the acquisition of lands, buildings and equipment for fire fighting purposes. The amount of money needed for fire appropriations or to pay bonds in the district is certified to the appropriate tax assessor for collection as taxes. (*N. J. S. A.* 40:101–1 *et seq.*)

In short, these statutes purport to confer broad governmental powers on camp meeting associations.

That such legislation runs afoul of the establishment-of-religion clause of the First Amendment is clear to me. The trial judge held that it violated all three of the tests enunciated in *Lemon v. Kurtzman, 403 U. S.* 602, 91 *S. Ct.* 2105, 29 *L. Ed.* 2d 745 (1971) in that the legislation had a religious rather than a secular purpose, its principal or primary effect was to advance religion and it fostered an excessive government entanglement with religion. In the main, it is the excessive governmental entanglement with religion that convinces me of the legislation's unconstitutionality. Broad governmental powers such as are here involved, can be vested in and exercised only by lawfully constituted governmental bodies, not in or by religious organizations. I would, therefore, invalidate the legislation on this ground. To the extent that *Percello v. Ocean Grove Camp Meeting Asso., 2 N. J. Misc.* 124 (Sup. Ct. 1924), aff'd o. b., 100 *N. J. L.* 407 (E. & A. 1924) holds otherwise, I would overrule it.

The majority opinion seems to concede that the statutory scheme does result in some "entanglement" of government with religion but that this is not fatal unless the entanglement is "excessive." I find the entanglement to be just that and the legislation a plain violation of the doctrine of separation of church and state. That the governmental powers granted Ocean Grove have been exercised in a benign way does not cure the constitutional infirmity.

A striking down of the present statutory scheme would not necessarily mean that Ocean Grove and the way of life it represents must come to an end. Geographically it is a part of Neptune Township which presently exercises limited governmental powers over the camp meeting grounds. That Township, in assuming full jurisdiction over the Ocean Grove area, could properly give recognition to Ocean Grove's unique physical characteristics and its historical site status. I would think that much of the secular customs, traditions

and practices which endear the Ocean Grove way of life to
so many could be preserved.

I, therefore, concur in the result reached by the majority,
but would bottom it on the broader ground heretofore dis-
cussed.

PASHMAN, J., concurring and dissenting. I concur in the
Court's judgment to the limited extent that it permits the
plaintiff to deliver newspapers for two and one-half hours
on Sunday mornings. However, I believe that the Court, in
its eagerness to save Ocean Grove's existing form of govern-
ment, has seriously undermined two fundamental guarantees
of the First Amendment. By restricting its holding to the
plaintiff's right to deliver newspapers before 2:30 A.M. on
Sundays, the Court fails to fully vindicate his free speech
and free press rights; this result surely casts a cloud on
similar activities of others which should also be protected.
More importantly, the Court strips the establishment clause
of all meaning by sanctioning the public role of the Associa-
tion's trustees and approving Ocean Grove's existing form
of government.

I

My disagreement with the Court's treatment of the free
press issue raised by the plaintiff is two-fold. First, the ma-
jority unwarrantedly narrows the scope of its discussion to
the two and one-half hours on Sunday morning when the
plaintiff normally delivers newspapers to Ocean Grove's resi-
dents. Although it also refers to the "early Sunday morning
hours *essential to* plaintiff's operations," [emphasis supplied],
the majority's constricted view of the plaintiff's claim sug-
gests that these ordinances may be used in civil and quasi-
criminal proceedings to prohibit deliveries by the plaintiff
if he drives at other times. *See ante* at 250–251. But it is pos-
sible that on any given Sunday morning the plaintiff may be
unable to complete his deliveries within that time. His sup-

pliers may be late; they may alter their schedules; his helpers may be ill. Is he to be subject to prosecution if he strays past the 2:30 A.M. deadline by an hour, or even a few hours? And is he to be foreclosed from changing his routine to make later deliveries during daylight hours? The plaintiff has made strenuous efforts to minimize the disruption in the early morning hours, but he has never yielded his constitutional right to carry on his business at other hours.[1] I cannot agree with the notion that plaintiff's right to sell or deliver newspapers wanes as the day progresses.

Second, the Court's statement of the question to be decided, *ante* at 246–247, leaves the distinct impression that the plaintiff holds a special status which may not be shared by others. Anyone else seeking to distribute Sunday publications sought by subscribers in Ocean Grove should have equal First Amendment rights. Additionally, are those rights inapplicable to those who seek to enjoy such deliveries?[2] Even with the majority's exception, these ordinances cannot be reconciled as reasonable forms of regulation dealing with the "time, place and manner" of such activity. Given the special function of newspapers in providing a conduit for informa-

---

[1] Admittedly, plaintiff's narrower claim may have been reflected in our decision to remand to determine whether Ocean Grove was estopped from enforcing these ordinances. However, the original pleadings in this action sought injunctions against enforcement of Ocean Grove's ordinances on the ground that they were unconstitutional and void. Hence, he has never abandoned his challenge on the broader issue.

[2] Although this litigation has been framed in terms of the constitutional rights of the plaintiff as a distributor of publications, it is settled that the First Amendment also guarantees the right of citizens to have access to sources of communication or publications. *See, e. g.,* *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) ; *Procunier v. Martinez,* 416 U. S. 396, 408–409, 94 S. Ct. 1800, 1801–1809, 40 L. Ed. 2d 224, 237 (1974) ; *Lamont v. Postmaster General,* 381 U. S. 301, 305, 85 S. Ct. 1493, 1495, 14 L. Ed. 2d 398, 401 (1965) ; *Martin v. Struthers, supra,* 319 U. S. at 143–144, 63 S. Ct. at 863–864, 87 L. Ed. at 1317.

tion and ideas, *see Miami Herald Publishing Co. v. Tornillo,* 418 *U. S.* 241, 252, 94 *S. Ct.* 2831, 2837, 41 *L. Ed.* 2d 730, 738 (1974); *New York Times Co. v. Sullivan,* 376 *U. S.* 254, 266, 84 *S. Ct.* 710, 718, 11 *L. Ed.* 2d 686, 698 (1964), I think that these ordinances are unduly restrictive and impermissible forms of regulation, even as qualified by the majority's ruling today.

Because I consider any exercise of public powers by Ocean Grove's governing body to be invalid under the establishment clause, see *infra* at 272 (Pashman, J., concurring and dissenting), I would vote to strike down all of its ordinances in their entirety. However, even apart from the establishment issue, I believe that the ordinances, as presently construed, impermissibly restrict the freedom of the press. Since the majority declines to construe the ordinances in question to comport with plaintiff's unqualified right to distribute newspapers, *cf. Borough of Collingswood v. Ringgold,* 66 *N. J.* 350, 365–67 (1975), I would strike down Section 1B of Ordinance 73–2. Similarly, Ordinance 30, which prohibits the use of a vehicle on Sundays, should have been declared unconstitutional, at least as applied to persons who are required to operate vehicles in order to deliver publications. Nevertheless, as I have already stated, this form of judicial pruning would be available only if the ordinances had been passed by a lawfully constituted municipality, a conclusion which I respectfully reject.

## II

Returning to the establishment issues posed by this case, I cannot agree with the majority's conclusion that the statute conferring governmental powers upon a religious group is constitutional. In my view, there are few cases that could present a more flagrant and glaring violation of the establishment clause than is posed by this set of facts.

The majority's analysis of Ocean Grove's constitutionality under the establishment clause is inconsistent with the

philosophy and the history of enforcement which that clause has enjoyed. The First Amendment to the Federal Constitution proclaims that the government "shall make no law respecting an establishment of religion." Art. 1, ¶ 4 of this State's Constitution similarly prohibits "establishment of one religious sect in preference to another" and forbids the requirement of a "religious . . . test . . . as a qualification for any office or public trust."[3] At the very least, these constitutional provisions mean that religious affiliation cannot be a prerequisite to holding public office or exercising governmental powers. Furthermore, I fail to see how they do not preclude the enactment and enforcement, by a religious body, of municipal ordinances which promote that group's sectarian beliefs. And yet today, by placing its imprimatur on Ocean Grove's enabling legislation (*N. J. S. A.* 40 :97–1 *et seq.*), the Court implicitly authorizes a municipality to limit positions of public trust and authority to members of the United Methodist Church.[4] It also gives its stamp of ap-

---

[3]The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." Its commands, having been incorporated into the Fourteenth Amendment, apply equally to the states. *Meek v. Pittenger*, 421 *U. S.* 349, 351, 95 *S. Ct.* 1753, 1756, 44 *L. Ed.* 2d 217, 224–225 (1975) ; *Murdock v. Pennsylvania*, 319 *U. S.* 105, 108, 63 *S. Ct.* 870, 872, 87 *L. Ed.* 1292, 1295 (1943) ; *Cantwell v. Connecticut*, 310 *U. S.* 296, 303, 60 *S. Ct.* 900, 903, 84 *L. Ed.* 1213, 1217–1218 (1940).
Art. 1, ¶ 4 provides:
There shall be no establishment of one religious sect in preference to another; no religious or racial test shall be required as a qualification for any office or public trust.

[4]As discussed below, see *infra* at 278 (Pashman, J., concurring and dissenting), the by-laws of the Association stipulate that the trustees "shall be and remain members of the United Methodist Church in good and regular standing." *Association By-Laws*, Art. III, § 1. A non-voting "associate" trustee must be a "member of a recognized Christian Church in good and regular standing." Art. III, § 5. *N. J. S. A.* 40 :97–5 confers the authority to exercise regulatory powers on the trustees, and *N. J. S. A.* 40 :97–6 gives the trustees' rules, by-laws, regulations, ordinances and resolutions the force of law.

proval to a set of Sunday closing laws, promulgated by a religious group, which go far beyond the limits staked out in decisions of this Court and the United States Supreme Court. *See McGowan v. Maryland,* 366 *U. S.* 420, 81 *S. Ct.* 1106, 6 *L. Ed.* 2d 393 (1961); *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199 (1960).[5]

The majority reviews Ocean Grove's history and governance by trustees of the Ocean Grove Camp Meeting Association of the United Methodist Church, concluding that it was not irrational for the Legislature to act as it did.[6] Apparently, the trustees have performed creditably over the last century in governing the camp ground. Ocean Grove now has the distinction of being enrolled in the National Register of Historic places and, we are told, has earned the admiration of other citizens and public officials. However, these considerations are utterly irrelevant to the constitutionality

---

[5]Since the parties have not raised a direct challenge to the validity of Sunday closing legislation (*N. J. S. A.* 2A:171-1 *et seq.*), I assume for the purposes of this appeal that such regulation is a legitimate exercise of the police power. However, I intimate no view as to the continued vitality of *Two Guys from Harrison, Inc. v. Furman, supra.*

[6]The Court's rationale for even reaching this issue, in view of its discussion of the "rule of necessity," *ante* at 250–252, is questionable. As long as the majority chooses to clothe itself in the mantle of judicial self-restraint in Part III of its opinion, it seems rather unbecoming to disrobe so abruptly in Part IV for the purpose of deciding a question the trial court "mistakenly" reached. If the Court is to be taken at its word, the defense of *N. J. S. A.* 40:97-1 *et seq.* is dicta which is unnecessary to the decision in this case. I note that *State v. Celmer,* 143 *N. J. Super.* 371 (Cty. Ct. 1976), holding Ocean Grove's Municipal Court unconstitutional for establishment reasons, proceeded without the municipality's participation, although it was given notice of the proceedings pursuant to *R.* 4:28-4. *Id.,* 143 *N. J. Super.* at 373. I also point out that our decision today will not necessarily "lay to rest" this controversy. The majority leaves *State v. Celmer* intact, *ante* at 252 n. 5, thus anticipating further litigation on this point. In such a case, of course, the United States Supreme Court would have appellate jurisdiction over any affirmance of a criminal conviction originally secured in Ocean Grove's Municipal Court. *See* 28 *U. S. C.* § 1257(2).

of *N. J. S. A.* 40:97–1 *et seq.* The question is not whether Ocean Grove's "way of life" deserves our approval or support; indeed, no one maintains that there is a necessary connection between Ocean Grove's form of government and its distinctive customs. Rather, the issue before us is the legitimacy of ceding all essential governmental functions to a private, self-perpetuating religious group whose primary purpose is to provide a site for religious services.

The majority argues that the regulatory powers delegated to the trustees were intended to fulfill the typical municipal tasks of securing public order and maintaining orderly development, not to promote the religious beliefs of the United Methodist Church. It finds that the primary purpose of this legislation is to guarantee a modicum of social peace and organization in an isolated locale with "unique" physical and social characteristics. Conceding that it may be "anomalous" to rely on a private association to perform this role for the State, the majority invokes the usual presumption of constitutionality and argues (1) that Ocean Grove's governmental scheme should be respected as a venerable, century-old institution, (2) that it now poses "no threat" to our constitutional ideals and (3) that it will not happen again.

I find this elaborate defense wholly unconvincing. Unlike the school aid cases, where the challenged legislation usually represents a rather subtle departure from the ideal of official neutrality, this appeal presents a straightforward instance of governmental favoritism. As presently operated, Ocean Grove's government violates the First Amendment by attaching a religious test to public office and by pursuing religiously-inspired policies. However, more important, its structure inevitably places the authority of the State behind the tenets of a particular sect by delegating the prerogatives of government to the trustees.

Both the statutory enabling legislation and the camp meeting association by-laws reflect more than a coincidence of secular and religious objectives. *N. J. S. A.* 40:97–5

confers law-making power upon the trustees of any camp meeting association and allows them to regulate the internal affairs of the community. Their responsibilities encompass construction and maintenance of public highways, streets, walks, parks, sewers and other municipal services. (*N. J. S. A.* 40:97-1, -2 and -3). They also hold a veto power over the construction of any public highway and public forms of transportation (*N. J. S. A.* 40:97-3), and they may enact laws to protect order, abate nuisances and preserve public health (*N. J. S. A.* 40:97-4).[7] These laws, whether passed in the form of ordinances, by-laws or regulations, may be enforced by the municipal court established by the trustees (*N. J. S. A.* 40:97-6 and -7) and are given the same effect as any municipal ordinance (*N. J. S. A.* 40:97-8).

The powers exercised by the trustees, then, are the virtual equivalent to those ordinarily delegated to local officials. By contrast, however, the trustees are not selected by traditional democratic procedures. The by-laws of the Association stipulate that the 26 trustees who manage the affairs of the corporation (and therefore exercise the authority delegated by the Legislature) shall include no less than ten ministers and ten laymen, all of whom "shall be and remain members of the United Methodist Church in good and regular standing." *By-Laws,* Art. III, § 1. If any trustee ceases to be a member of the Church, his position may be declared vacant by a two-thirds vote of the remaining trustees present at a regular meeting. *Ibid.* The by-laws also make provision for the election of "associate" trustees who have the privilege of attending meetings, but not of voting. *By-Laws,* Art. III, § 5. These persons must

---

[7] *N. J. S. A.* 2A:171-6 gives additional powers to the trustees in counties whose voters have modified the Sunday closing laws by referendum. Like municipalities in such counties, they are permitted to regulate the conduct of various forms of recreation, sport and amusement, and their commercialization, by adopting rules or ordinances.

be members of "a recognized Christian Church in good and regular standing." *Id.* The trustees elect, from their membership, the officers and members of the executive and program committees. *By-Laws,* Art VI, §§ 1, 4; Art. VIII, § 2. The executive committee serves as the administrative arm of the board and represents the board in all official matters. *By-Laws,* Art. V, § 2; Art. VII. The program committee organizes the religious services and meetings, and its chairman reports at each meeting of the executive committee. *By-Laws,* Art. VIII, §§ 2, 4.

This structure makes it impossible to segregate the religious duties of the trustees from their secular functions. As a group, the board of trustees has the single purpose of providing "a proper, convenient, and desirable permanent camp meeting ground and Christian seaside resort" for members of the United Methodist Church. *By-Laws,* Art. II. While their immediate objectives no doubt coincide with those of any governing body of a municipality, they are also committed to other ends which are peculiar to their religious orientation.

The existing arrangement stems from the original charter. That act of incorporation required the 26 trustees to be members in good standing of the church. It empowered them to pass by-laws and to appoint peace officers who could enforce their rules and regulations, *L.* 1870, *c.* 157, §§ 5, 7. In its essential features, little has changed in Ocean Grove's governing council as successive acts have increased the board's powers.[8] See *ante* at 255–256. It is in-

---

[8] Although the current statute no longer contains a direct reference to the religious composition of Ocean Grove's governing board, its provisions give the board's · by-laws "the force and effect of laws." *N. J. S. A.* 40:97–6. It is somewhat disingenuous for the majority to suggest that these self-imposed religious qualifications for selection of trustees can be severed from the underlying legislation. *See ante* at 260 n. 10. In any event, the original charter, which is still in effect, requires the trustees to be members in good standing of the church. *See ante* at 275 n. 4 (Pashman, J., concurring and dissenting).

conceivable that this fusion of civil and religious authority does not violate the underlying principles of the establishment clause, whether they are interpreted as erecting a "wall of separation between Church and State," *Everson v. Board of Education*, 330 *U. S.* 1, 16, 67 *S. Ct.* 504, 512, 91 *L. Ed.* 711, 723 (1947); as forbidding "sponsorship, financial support and active involvement of the sovereign in religious activity," *Walz v. Tax Commission*, 397 *U. S.* 664, 668, 90 *S. Ct.* 1409, 1411, 25 *L. Ed.* 2d 697, 701 (1970); or as commanding a benign neutrality of government toward religion, *Zorach v. Clauson*, 343 *U. S.* 306, 313–314, 72 *S. Ct.* 679, 96 *L. Ed.* 954 (1952).

The majority appears to suggest that this union of government and religion, rather than tending to "destroy government and degrade religion," *Engel v. Vitale*, 370 *U. S.* 421, 431, 82 *S. Ct.* 1261, 1267, 8 *L. Ed.* 2d 601, 608 (1962), was "functionally appropriate" in view of Ocean Grove's pattern of land ownership and social composition. *Ante* at 258. This is an interesting assertion, but it is constitutionally preposterous. It would be equally sensible for the Legislature to permit only Catholics or Jews to govern when they constitute the overwhelming majority, or simply to yield governmental powers to priests and rabbis in communities which respect them as moral leaders. Both the First Amendment and Art. 1, ¶ 4 of the New Jersey Constitution foreclose that option, the latter by its express language ("no religious . . . test shall be required as a qualification for any office or public trust") and the former by the Supreme Court's decision in *Torcaso v. Watkins*, 367 *U. S.* 488, 81 *S. Ct.* 1680, 6 *L. Ed.* 2d 982 (1961). *In Torcaso*, the Court unanimously declared unconstitutional a provision in the Maryland Constitution which stated that "no religious test ought ever to be required as a qualification for any office of profit or trust in this State, other than a declaration of belief in the existence of God. . . ." Writing for the Court, Justice Black rejected the

historically and constitutionally discredited policy of probing religious beliefs by test oaths or limiting public offices to persons who have, or perhaps more properly profess to have, a belief in some particular kind of religious concept.

[367 *U. S.* 488, 494, 81 *S. Ct.* 1680, 1683, 6 *L. Ed.* 2d 982, 987]

Clearly, the form of government now authorized by *N. J. S. A.* 40:97–1 *et seq.* favors members of the United Methodist Church over members of other religious sects and nonbelievers.[9]

Even though this aspect alone would be sufficient to justify invalidation of the challenged legislation, there are other factors which reinforce such a conclusion. The original charter proclaimed that the purpose of the camp meeting association was to provide a "christian seaside resort" for members of the Methodist Episcopal Church, *L.* 1870, *c.* 157, § 1, and *N. J. S. A.* 40:97–1 currently refers to "any

[9]It is no answer to say that *Torcaso's* holding is based on the free exercise clause, and therefore inapposite to the plaintiff's claim. See *ante* at 260 n. 10. The two religion clauses cannot be parsed so neatly: while each focuses on a different form of governmental interference with religious freedom, the clauses overlap substantially. Thus, in *Torcaso*, Justice Black criticized the Maryland constitutional provision requiring office holders to declare their belief in the existence of God because "the power and authority of the State of Maryland is thus put on the side of one particular sort of believers — those who are willing to say they believe in 'the existence of God.' " *Id.*, 367 *U. S.* at 490, 81 *S. Ct.* at 1681, 6 *L. Ed.* 2d at 984. He recounted the history of such religious tests in the colonies and observed that "The effect of all this was the formal or practical *'establishment'* of particular religious faiths in most of the Colonies, *with consequent burdens on the free exercise of the faiths* of nonfavored believers." *Id.* (Emphasis supplied; footnote omitted). *See also Engel v. Vitale, supra* (free exercise clause and establishment clause overlap; no showing of coercion necessary to raise establishment claim).

Moreover, the *Torcaso* court did not address the plaintiff's claim that Article VI of the Federal Constitution was applicable to state offices as well as federal offices. Its holding was based solely on the First and Fourteenth Amendments. *Id.*, 367 *U. S.* at 489 n. 1, 81 *S. Ct.* at 1680, 6 *L. Ed.* 2d at 984.

camp meeting association or other corporation heretofore or hereafter incorporated . . . for the purpose of providing any religious body or society with a permanent camp meeting ground or place for religious services." This statutory pattern refutes any assertion that the Legislature's delegation of municipal functions is valid as pertaining to a class of private associations or corporations uniquely suited to carrying out the duties of government under unusual local conditions.[10] Only societies incorporated for the purpose of providing a locale for *religious* activities benefit from these enactments. Thus, it is impossible to analogize this statute with facially neutral provisions which supply essential services, such as police and fire protection, sanitation facilities and transportation to all groups without regard to religious affiliation. *See Roemer v. Maryland Public Works Board,* 426 *U. S.* 736, 745–748, 96 *S. Ct.* 2337, 2344–2345, 49 *L. Ed.* 2d 179, 187–188 (1976); *Everson v. Board of Education, supra,* 330 *U. S.* at 17–18, 67 *S. Ct.* at 512–513, 91 *L. Ed.* 2d at 724–725. *Cf. Walz v. Tax Commission, supra.*

Similarly, these enactments differ from the various acts authorizing certain named religious groups to exercise specified legal rights and to regulate their internal affairs (*N. J. S. A.* 16:1–1 *et seq.* through *N. J. S. A.* 16:19–1 *et seq.*). The latter are designed to give religious groups the same prerogatives afforded non-sectarian private associations. They offer an alternative to *N. J. S. A.* 15:1–21 which permits religious societies to incorporate under the statutory sec-

---

[10]As the majority recognizes, the legitimacy of delegating governmental powers to *any* private organization is highly questionable, or "anomalous." *Anté* at 264. Its reference to *Humane Soc. of U. S. v. N. J. State Fish and Game Council,* 70 *N. J.* 565 (1976) highlights the doubly anomalous aspect of granting such powers to a *religious* sect, given the existing constitutional provisions prohibiting the use of "religious tests." It seems incongruous to suggest that Ocean Grove's government could be a violation of the equal protection or due process clauses, but not of the establishment clause.

tions applicable to nonprofit corporations and associations. To the extent that they assist particular religious sects by making special provision for their idosyncratic features, they are simply acting in accordance with the dictates of the free exercise clause.[11]

In fact, contrary to the majority's suggestion that Ocean Grove's history was marked by universal approval and internal harmony, as well as secular goals, its history belies both of these contentions. Numerous controversies in the early 1900's arose from its peculiar status. *See* Brewer and McMahon, *Perspectives on Ocean Grove,* 1869–1949 at 62–70 (1939). Among these were several attempts to reconstitute Ocean Grove as a borough, including one such effort which almost succeeded.[12] The events surrounding that effort resulted in both legislative and judicial acknowledgement of Ocean Grove's religious purpose. In 1920 the Legis-

---

[11]When civil courts are called upon to decide property disputes of religious groups, they are constrained by the First Amendment to avoid undue entanglement in controversies of a doctrinal nature. *Serbian Orthodox Diocese v. Milivojevich,* 426 *U. S.* 696, 96 *S. Ct.* 2372, 49 *L. Ed.* 2d 151 (1976) ; *Presbyterian Church v. Hull Church,* 393 *U. S.* 440, 89 *S. Ct.* 601, 21 *L. Ed.* 2d 658 (1969) ; *Kedroff v. St. Nicholas Cathedral,* 344 *U. S.* 94, 73 *S. Ct.* 143, 97 *L. Ed.* 120 (1952). This is particularly so when the controversy revolves around the decision of a church which is hierarchical in structure. Since the courts will enforce decisions in accordance with the internal structure, or policy, of a sect (whether congregational, presbyterial or episcopal), it is natural for the legislature to fashion procedures which correspond to the structure of the sect. *See generally,* Note, "Church-Property Disputes," 75 *Harv. L. Rev.* 1142 (1962) ; Gianella, "Religious Liberty, Nonestablishment, and Doctrinal Development," 81 *Harv. L. Rev.* 513, 535–537 (1968).

[12]The reform was organized by a group of the community's leading citizens who engineered the passage of a bill through the Legislature subject to approval by local referendum. Gibbons, *supra,* at 64–65. The bill was overwhelmingly supported by the voters, and a special election was held to select local officials. However, another organization opposed to the new borough enlisted the aid of the Attorney General in challenging the act on constitutional grounds. The Court of Errors and Appeals struck down the statute. *McCran v. Ocean Grove,* 96 *N. J. L.* 158 (1921).

lature did change Ocean Grove's governmental structure to a purely secular one, but it made special provisions to preserve the "religious integrity" of the community by circumscribing the power of the newly elected officials in several areas. *L. 1920, c. 96*.[13] Specifically, the act prohibited any change in the existing ban on Sunday vehicular traffic and ruled out any municipal approval for construction of public highways through the borough. *L. 1920, c. 96, § 1*. The law was challenged on numerous grounds, resulting in a declaration by the Court of Errors and Appeals that it was a special law regulating the internal affairs of a municipality in violation of *N. J. Const.* (1875), Art. 4, § 7, ¶ 11. *McCran v. Ocean Grove, 96 N. J. L.* 158 (E. & A. 1921). In refusing to excise the offending provisions of the Act, the Court expressly noted the fact that the legislation was intended to further religious goals:

[O]ne of the controlling motives which influenced the legislature in the enactment of the statute under review, was the preservation in the newly-created borough, among other things, of so much of the religious integrity of the earlier municipality as was exhibited in its action in keeping its street free from Sunday travel and in preventing any public highway or boulevard from passing through its territorial limits.

[96 *N. J. L.* at 164–165].

---

[13]The preamble recited:

    WHEREAS, The said association is willing to surrender such municipal control, but *without violating the religious integrity of Ocean Grove*, and is also desirous of preserving inviolate all those rights appertaining to and included in such religious integrity; and

    WHEREAS, it is *deemed advisable to separate the municipal and religious functions*, except as this act provides; and

    WHEREAS, It is the will and desire of the said Ocean Grove Camp Meeting Association, the lessees, and the residents of the territory hereinafter particularly described, that a borough form of government shall be provided by law, but which shall have no authority to interfere with the said Ocean Grove Camp Meeting Association in *maintaining the religious character and integrity of Ocean Grove*.

[Emphasis supplied]

This ready concession of a legislative purpose to uphold the so-called "religious integrity" of Ocean Grove flatly contradicts the majority's repeated assertions that the delegation of powers to the board of trustees was animated by secular objectives. In fact, the most persistent theme in Ocean Grove's history is the steadfast defense of its Sunday laws by the local authorities. Even assuming that a legislative body may promote secular policies whose ends happen to coincide with sectarian practices, *see Two Guys from Harrison, Inc. v. Furman, supra; McGowan v. Maryland, supra,* it does not follow that it may design a municipal government whose primary goal is to safeguard religious customs. The majority suggests that the proper course to follow, if these Sunday closing laws were indeed involved, would be to strike down these regulations rather than dismantle the entire governmental apparatus. However, the Sunday closing rules adopted by the trustees and enforced vigilantly over the years constitute a primary — perhaps the sole — justification for this municipal scheme. Ocean Grove could be governed efficiently by a secular form of government, but any such change apparently has been resisted as a threat to the continued vitality of the Sunday closing laws.

When we turn to examine these local restrictions, enacted into law by Ordinance 73–2, we see that they cannot be rationalized by any conception of the general health, safety and welfare of Ocean Grove's citizens.[14] The list of prohibited acts in Ordinance 73–2 is not limited to guaranteeing a uniform day of rest and an opportunity for leisure and amusement for Ocean Grove's residents. Rather, the sweep of its prohibitions, extending to virtually all forms

---

[14]This, of course, assumes that the Sunday closing laws upheld in *Two Guys from Harrison, Inc. v. Furman,* are valid exercises of the police power. *See ante* 276 n. 5, Pashman, J., concurring and dissenting.

of recreation and manual labor,[15] suggests "orientation to a sectarian desire to protect the Sabbath as such against 'desecration.'" *Two Guys from Harrison, Inc. v. Furman, supra,* 32 *N. J.* at 217. *See Masters-Jersey v. Paramus,* 32 *N. J.* 296, 301 (1960) (prohibition of all recreation raises a police power issue).

By contrast, in *McGowan v. Maryland, supra,* Chief Justice Warren emphasized the many exceptions to the Maryland Sunday closing laws, and the absence of a blanket prohibition against Sunday work or bodily labor. *Id.,* 366 *U. S.* at 447–448, 81 *S. Ct.* at 1116–1117, 6 *L. Ed.* 2d at 411–412. He observed:

---

[15]The ordinance provides:

Section 1. The following shall be prohibited within the geographical limits of Ocean Grove on Sunday, also known as the Sabbath, throughout each year:

A. The riding, parking, or allowing to remain parked, of all vehicles, including bicycles, automobiles, buses, trucks, trailors, horses or other livestock, and wagons, except in enclosed areas.

B. The selling or delivering of newspapers, periodicals, advertising circulars, vending of any form of merchandise, including milk, prepared or unprepared foodstuffs, except when served by and consumed within a restaurant, coffee shop, or other establishment permitted to serve foodstuffs.

C. Ocean bathing.

D. Fishing, boating, sun bathing or the wearing of bathing apparel in public.

E. The building, repair or construction of buildings or structures, including the engaging in carpentry, painting, machinery and similar activities both inside and outside of said buildings or structures.

F. Athletic exercises; the playing of games in vacant lots, playgrounds, parks, streets, sidewalks or promenades; roller skating; ice skating; and similar activities.

G. The mowing and care of lawns, shrubbery and flowers.

H. The placing or exposure of clothing, bedding, or other articles on wash or drying lines or lines of similar character.

Section 2. Any person, persons or corporation violating any of the provisions of this ordinance shall, upon conviction, pay a fine not exceeding Two Hundred ($200.00) Dollars or be imprisoned in the County Jail for a period not exceeding Thirty (30) days, or both fine and imprisonment.

Each day that this ordinance shall be violated shall be deemed and taken to be a separate and distinct offense.

These provisions, along with those which permit various sports and entertainments on Sunday, seem clearly to be fashioned for the purpose of providing a Sunday atmosphere of recreation, cheerfulness, repose and enjoyment. Coupled with the general proscription against other types of work, we believe that the air of the day is one of relaxation rather than one of religion.

> [*Id.*, 366 *U. S.* at 448, 81 *S. Ct.* at 1117,
> 6 *L. Ed.* 2d at 412]

I do not believe that Ocean Grove's custom of preserving Sunday as an occasion for rest and quiet need pass away altogether. Its historical character, now officially recognized by the Federal Government, would supply a rationale for local rules reflecting its long adherence to Sunday closing laws. However, they would have to make due allowance for nondisruptive activities. Moreover, they could not prohibit vehiclar traffic necessary for emergencies (such as ambulances or fire trucks) and reasonably required for constitutionally protected activities (such as the plaintiff's deliveries). Without a local government susceptible to attack on First Amendment grounds, these rules would lose their sectarian character; in all likelihood, they would also be enforced in a more reasonable manner, thus preventing controversies such as the one giving rise to this litigation.

For these reasons, I am unconvinced by the majority's argument that the long existence of this statutory plan is "a transcending consideration" which creates a heavy presumption against its invalidity. If I am correct in assuming that Ocean Grove can survive a transformation of its political system without losing its attractive features, then the most compelling reason for upholding its present status is a judicial deference to the legislative will. This general policy of judicial restraint has little force when a law has survived largely without close scrutiny of weighty constitutional claims. As the majority points out, the Court of Errors and Appeals gave only passing consideration to a similar argument in *Percello v. Ocean Grove Camp Meeting Association,* 100 *N. J. L.* 407, aff'g o. b. 2 *N. J. Misc.* 124 (Sup. Ct.), and even there, the Supreme Court's opinion relied heavily

on prior cases in which the issue had not been addressed. *Id.,* 2 *N. J. Misc.* at 126–127.

The import of the majority's reasoning seems to be that the failure of these early decisions to detect a constitutional flaw, where the issue had not been raised, prevents this Court from doing so now. This case differs radically from *Walz v. Tax Commission, supra,* where a similar argument was given considerable weight. *Walz* was a tax case[16] which concerned a form of governmental assistance to religion dating from the earliest days of the Republic. As Justice Brennan observed in his concurring opinion: "Rarely if ever has this Court considered the constitutionality of a practice for which the historical support is so overwhelming." *Id.,* 397 *U. S.* at 681, 90 *S. Ct.* at 1418, 25 *L. Ed.* 2d at 709. Had the Court ruled differently, it would have exchanged one constitutional defect (financial assistance to churches) for another (excessive entanglement in financing). Rather than terminate this form of economic subsidy, the Court chose to maintain the mutual separation of Church and State by permitting the taxing authorities to treat church property like that of other private, non-profit associations organized to provide social services and to contribute to community well-being. Here, however, the Legislature has carved out a special place for a narrow class of private sectarian societies which fosters continual interplay between civil authorities and religious leaders.[17] Invalidation of this legislation would restore Ocean Grove's religious community to a

---

[16]Hence, the relevance of *Justice Holmes' dictum in New York Trust Company v. Eisner,* 256 *U. S.* 345, 349, 41 *S. Ct.* 506, 507, 65 *L. Ed.* 963, 982 (1921), referred to by the majority.

The plaintiffs in *Walz* argued that New York's exemption of religious property from the ad valorem property tax was functionally a subsidy. Although the Court stressed the distinction between an exemption and a subsidy, it viewed them as economically equivalent.

[17]The "entanglement" test, criticized by the majority, *ante* at 262 does seem superfluous in this context. For instance, it matters little that Ocean Grove's citizens and neighbors approve its present constitution if its government leadership is limited by law to members

status equivalent to all other sects, and end, once and for all, this fusion of government and religion.

Moreover, mere passage of time has no talismanic significance. The First Amendment's religious guarantees were not expressly incorporated into the Fourteenth Amendment until 1940 when *Cantwell v. Connecticut, supra,* was decided. Prior to *McCollum v. Board of Education,* 333 *U. S.* 203, 68 *S. Ct.* 461, 92 *L. Ed.* 649 (1947), "released time"[18] arrangements had been widespread for more than 30 years. *Id.,* 333 *U. S.* at 222–223, 68 *S. Ct.* at 470–471, 92 *L. Ed.* at 664–665 (Frankfurter, J., concurring). School prayer was not declared unconstitutional until 1962. *Engel v. Vitale, supra.* The suggestion that we are restricted today by a summary treatment of this issue in 1924 by a court interpreting our State Constitution overlooks the dramatic developments in the area of the First Amendment. In any case, *Percello* should be rejected to the extent that it holds that this statutory scheme does not violate Art. 1, ¶ 4 of this State's Constitution. I would overrule *Percello* as a matter of state constitutional law since it is beyond argument that Ocean Grove currently attaches a religious test to those who would hold public office. *Ante* at 279, 284 (Pashman, J., concurring and dissenting).

## IV

Admittedly, it is a rare, if not unprecedented occurrence, for the Court to be asked to rule upon such a glaring violation of settled principles. The normal inquiry in this area

of the United Methodist Church. Neither is there significant danger of governmental surveillance of religious activity. The evil here stems from the concentration of political power in the leadership of a religious group; thus, the integrity of the civil order is more threatened than the freedom of the religious sphere.

[18]"Released time" arrangements permitted various groups to conduct religious classes on public school premises. These periods of religious instruction were substituted for study of secular subjects or for other extracurricular activities of a secular nature.

has been concerned with departures from the First Amendment which are far more subtle, as reflected in Chief Justice Burger's remarks in *Lamon v. Kurtzman,* 403 *U. S.* 602, 91 *S. Ct.* 2105, 29 *L. Ed.* 2d 745 (1971):

A law may be one 'respecting' the forbidden objective while falling short of its total realization. A law 'respecting' the proscribed result, that is, establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.
[403 *U. S.* at 612, 91 *S. Ct.* at 2111, 29 *L. Ed.* 2d at 755.]

Thus, normally a court is required to determine whether a legislative enactment *tends* to encourage or promote a single religion or all religions generally, *Committee for Public Education v. Nyquist,* 413 *U. S.* 756, 771, 93 *S. Ct.* 2955, 2965, 37 *L. Ed.* 2d 948, 962 (1973); *McCollum v. Bd. of Education, supra,* 333 *U. S.* at 211–212, 68 *S. Ct.* at 465, 466, 92 *L. Ed.* at 659, or in Chief Justice Burger's words, "*could* lead to such establishment and hence offend the First Amendment." [*Supra;* emphasis added.] But here, I am afraid that the majority's myopic search for the subtle violation of the establishment clause has resulted in its overlooking the obvious flaw. Here the legislative enactment not only tends to encourage religion but also effectively institutes a church or creed as the official faith in Ocean Grove. The statute conferring powers upon that municipality implicitly limits public office to members of a specific religion, and hence allows the municipality to use governmental power to order the lives of its inhabitants in conformity with the orthodoxy of its religious tenets.

The doctrine of separation of church and state in this country is the result of a long history of experiences which confirm its wisdom. So strong has been our emphasis on the principles of civil liberty which underlie this doctrine — the right to practice one's own religion free of governmental interference — that it has been considered one of the most

fundamental of constitutional rights. The principle embodied in the establishment clause of the First Amendment is based upon the settled precept that "[t]he place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind." *Abington School District v. Schempp*, 374 *U. S.* 203, 226, 83 *S. Ct.* 1560, 1574, 10 *L. Ed..* 2d 844, 860–861 (1963). It upholds the right to practice one's religion free from governmental interference, but it also eliminates the right to seek the prerogatives of official status for one's creed. I believe that the Court's holding in this case amounts to a neglect of these principles, and the result of its failure to realize the implication of its own decision.

I cannot disagree more with the majority's apparent belief that a decision striking down the statute conferring governmental powers on Ocean Grove would threaten that community's way of life. That view is based upon the entirely mistaken notion that spiritual or cultural habits which exist in Ocean Grove are the product of its form of government. They are not. The religious convictions which impel a community of persons to adopt practices similar to those in Ocean Grove are not the type which survive because of official edicts. They continue because of the strong personal convictions of the persons who live there. These attitudes and beliefs can only be harmed by a decision which allows governmental influence to take the place of individual or church leadership.

Justice SCHREIBER joins in this opinion.

SULLIVAN, J., concurring in the result.

*For modification and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN and CLIFFORD and Judge CONFORD—5.

*Concurring in part and dissenting in part*—Justices PASHMAN and SCHREIBER—2.