**NOT FOR PUBLICATION WITHOUT APPROVAL OF**
**THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



MALA SUNDAR
JUDGE

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

March 4, 2021

James M. McGovern, Jr., Esq.
Davison, Eastman, Munoz, Paone, P.A.
Attorneys for Plaintiff

Gene J. Anthony, Esq.
Attorneys for Defendant

> Re:  Ocean Grove Camp Meeting Ass'n of the United Methodist
> Church v. Township of Neptune
> Block 148, Lot 1 (54 Pitman Avenue)
> <u>Docket No. 005650-2018</u>

Dear Counsel:

This letter is the court's opinion deciding the parties' respective summary judgment motions filed in the above captioned matter. Defendant's summary judgment motion seeks affirmance of its denial of local property tax exemption for tax year 2018 on the above captioned property, an administrative office building (Office) owned by plaintiff and located in defendant taxing district (Township). The Township argues that plaintiff is not affiliated with any organized religious order or organization, and further uses the Office to process revenues (the largest being rents and proceeds from summer entertainment). Therefore, per the Township, the Office is being used in furtherance of plaintiff's for-profit activities and should be taxed. The motion was supported by depositions of several of plaintiff's employees (past and present) or other representatives, and certain documents as to plaintiff's incorporation and activities.

Plaintiff's cross-motion for summary judgment seeks restoration of the Office's tax exemption for both tax years 2017 and 2018 (both years being included in plaintiff's complaint for tax year 2018). Plaintiff argues that the Office is its administrative building where, in






addition to property management, several other activities which are directly in furtherance of its non-profit, charitable/religious purposes are also being administratively performed. Its motion was supported by certifications of two of plaintiff's representatives, with attached documents.

For the reasons stated below, the court finds that it cannot decide the merits of the exemption denial for tax year 2017 since plaintiff did not timely challenge the same. The court reverses the tax exemption denial for the Office for tax year 2018 thus grants plaintiff's cross-motion for summary judgment as to this tax year.

## **PROCEDURAL HISTORY**

Plaintiff is a federally income tax-exempt entity under I.R.C. §501(c)(3). Until tax year 2016, the Office was granted local property tax exemption by the Township.

By letter dated November 21, 2016, the Township's assessor denied tax exemption to the Office for tax year 2017. The reason was:

> The property's use as of October 1 of the pretax year. The use must be a qualifying exempt use. Property's use must be an integral part of the exempt organization's operations, not just a convenience, and reasonably necessary for the proper and efficient fulfillment of the organization's exempt purposes. Property must be actually used for a permitted or qualifying use pursuant to the statute under which exemption is sought.

There was no timely appeal from this tax exemption denial.

On March 27, 2018, plaintiff filed a direct complaint challenging the 2018 local property tax assessment of $1,057,300 (allocated $515,600 to land and $541,700 to improvements) imposed on the Office on grounds the assessment was in excess of the Office's true value. Plaintiff also alleged that the Office was improperly denied a tax exemption for tax years 2017 and 2018. The Township filed a counterclaim alleging that the Office is not entitled to a tax exemption and that it was under-assessed.

2

# FACTS

The following facts are taken from deposition testimony and certifications of plaintiff's employees or other representatives, and undisputed documents as to plaintiff's incorporation, activities, and operations.

*Plaintiff's Statutory Incorporation*

Plaintiff's history culminating into its incorporation is detailed in <u>Schaad v. Ocean Grove Camp Meeting Ass'n of the United Methodist Church</u>, 72 N.J. 237, 254-58 (1977) and <u>State v. Celmer</u>, 80 N.J. 405, 410-13 (1979). Methodist clergymen bought 260 acres of land near the ocean in Ocean Grove to establish camp meeting grounds in 1869. <u>Schaad</u>, 72 N.J. 254. The organizers incorporated under <u>L.</u> 1870, <u>c.</u> 157 as the Ocean Grove Camp Meeting Association of the Methodist Episcopal Church[1] which retained "title to all the lands . . ." and "sold leaseholds for 99 years, renewable in perpetuity, at a fixed sum down and a stated annual ground rental" to the residents due "[t]o maintain the special character of the place." <u>Schaad</u>, 72 N.J. 254.

When incorporated, plaintiff's purpose was "that of providing and maintaining for the members and friends of the Methodist Episcopal Church a proper, convenient and desirable permanent camp meeting ground and [C]hristian seaside resort." <u>L.</u> 1870, <u>c.</u> 157 §1. Article II of plaintiff's By-Laws reiterate the "object" of plaintiff is "to provide and maintain for members and friends of the United Methodist Church a proper, convenient, and desirable permanent camp-meeting ground and Christian seaside resort as provided in the Statute of Incorporation."

---

[1] The name was changed to "The Ocean Grove Camp Meeting Association of The United Methodist Church." <u>Celmer,</u> 80 N.J. at 410.

Another "Methodist camp meeting association[] . . . was incorporated as the Camp Meeting Association of the Newark Conference of the Methodist Episcopal Church" in the 1800s, "and maintains a community called Mount Tabor in Morris County." <u>Schaad</u>, 72 N.J. at 255.

Plaintiff's Mission Statement is "providing opportunities for spiritual birth, growth and renewal through worship, education, cultural activities and recreation in a Christian seaside setting."

Twenty-six trustees manage plaintiff's affairs. Id. §4. They must be members of the Methodist church. L. 1870, c. 157, §4; Celmer, 80 N.J. at 411 (trustees had to "be and remain members of The United Methodist Church in good and regular standing"). Associate trustees should be members of a Christian Church "in good and regular standing." By-Laws, Art. III, §4. Honorary trustees can be anyone who is "Christian Clergy or lay person, by reason of his or her contribution to Christianity, and interest and support of" plaintiff. Id., Art. III, §10.

The Trustees manage the daily operations by serving on the "Board's executive, program and development committees." Celmer, 80 N.J. at 412. "The executive committee serves as the administrative arm of the Board, and represents the Board in all official matters," while the "program committee" is responsible for "organizing religious services and meetings" for residents, and the "development committee is charged with the duty of initiating and implementing financial programs necessary to provide and maintain [Ocean Grove] . . . as a proper, convenient and desirable permanent Camp Meeting Ground and Christian Seaside Resort." Ibid. (internal quotation marks omitted).

Currently, plaintiff is not a church within the conference of Methodist churches, nor under the control of a Bishop of the United Methodist Church. There is no "agreement" between the United Methodist Church and plaintiff, and plaintiff is not considered as a congregation of the United Methodist Church.

Plaintiff's incorporating statute authorized it to purchase, hold, and/or sell real property, "in fee simple or otherwise" as deemed "necessary, proper or desirable for the purposes and objects of the corporation." L. 1870, c. 157, §2. Improvements "deemed necessary or desirable"

4

could also be made by plaintiff.  Id. §3.  Any real and personal property owned by plaintiff (not to exceed $5,000 in value) is "exempt from all assessment and taxation."  Id. §6.  "Any surplus funds remaining . . .  after defraying the necessary expenses thereof for improvements or otherwise," is to be "devoted to such charitable, benevolent or religious objects or purpose" as agreed to by plaintiff's trustees.  Ibid.

*The Office*

The Office is a building in the Township.  It is used by plaintiff for carrying out a variety of its administrative functions.  Eleven full-time employees work at this space.  It has a reception area, a conference room, offices, and a community center.  The space within the Office is used to hold committee meetings, community meetings (including Ocean Grove Homeowners' Association), Bible studies, Youth programming, choir rehearsal, religious seminars, marriage conferences, Ocean Grove tent and cottage meetings.   Also conducted in the Office are various administrative activities connected with plaintiff's operations and programs conducted by plaintiff's departments/committees (Program, Operation, Development, Finance) and offices (Beach Operations, Ladies Auxiliary, Gospel Music Ministry, Ocean Grove Auditorium Association, and Ocean Grove Beautification Program).  Each department or office manages and effectuates various activities of plaintiff.

For instance, the Program Department or Committee, is responsible for activities such as Worship in the Grove, Sunday Worship in the Great Auditorium, Children and Teen activities, Christian education, performing arts (including children's shows/plays and musical shows such as Songs on a Summer Afternoon by Broadway performers and Ocean Grove Summer Band; Great Auditorium concerts; Summer Star Classical Music series; Atlantic Wind Ensemble; Navy Band Pop Rock; and Orchestras of St. Peter by the Sea), and community events (Community

Day; Victorian Day; Ocean Grove Forever; Giant Craft Fair). The Operations Department or Committee ensures the above activities occur, and is responsible for, among others, vendor management, project management, and facilities maintenance. At the Office is where employees and committees meet, strategize, manage, coordinate, and execute several aspects of plaintiff's activities concerning adult and children education and the spread of community awareness of Christian beliefs and values.

The Finance Department ensures, among others, processing/collection of the revenues from all sources. Administration of plaintiff's rental activities including applications, customer service, invoicing, accounting, and collection of fees and rentals, are conducted at the Office by one full-time employee who uses 20% of his (her) time in conducting the referenced activities, and who has other duties which account for the remainder of the employee's full time employment. The Finance Department is also responsible for collecting/processing gifts, grants, donations, and contributions. Also included is processing of revenues from plaintiff's bookstore, The Hub, located in the Township. The store sells religious books, artifacts, and other religious paraphernalia. Processing/collecting of revenues from all sources are conducted at the Office.

*Plaintiff's Revenue Generating Activities*

Plaintiff owns the land in the Township pursuant L. 1870, c. 157, §2, and leases the same. See Schaad, 72 N.J. 254. In this endeavor, it receives annual ground rents. The rate is $10.50 per year per residence for the 99-year ground leases.[2] Per a former employee, depending on when the lease commenced, the rent could be higher (for instance $50-$100 if in the 1950s, then up to $400 in more recent years). Plaintiff does not require property owners (ground lessees) to

---

[2] There was some discrepancy as to the number of ground leases which generated the $10.50 per year rent. One certification stated 2800, another stated 2180, of which 1,180 are residential which pay the annual $10.50 ground rent.

be of, or follow, plaintiff's religious affiliation, however, does require compliance with its rules and regulations (such as no alcohol). Annual ground lease rents for commercial tenants are higher and are at a different rate for condominiums.[3] Plaintiff imposes a charge for lease renewals or property transfers, the latter being $225 per application, and a ground property search fee of $50. Tenants or residential owners are responsible for their property's maintenance. Local property taxes for such properties are paid by the tenants or residential property owners.

Plaintiff also receives revenue from leasing tents and cottages ($5,000 to $7,500) during summer so tenters can combine religious worship with enjoyment of nature. Tenters need not be Methodists. However, they are expected to support plaintiff's mission by making donations, attending worship services, and volunteering. Every summer plaintiff organizes Camp Meeting Week which offers participants Christian worship and prayer, religious education and exploration, recreation, and renewal "along the beautiful New Jersey Shore." The tents are dismantled after summer.

Another source of rental revenue or facility use is rents from leasing rooms or using the space in Grove Hall, which plaintiff deems its Retreat and Conference Center.[4]

All revenues from rentals are deposited into plaintiff's general operating account to be used for plaintiff's operating expenses. Per plaintiff, the approximate ground rent in total (for residential, commercial and condominiums) is about $339,000, which is 6.78% of its budget.

---

[3] Plaintiff's commercial tenants include The Windmill (a hot dog retailer); Ruding and Wood (a furniture renovator, the rear of the property however being used by plaintiff as a garage), and Kearny Bank and Emporium. Per the Township's assessor's certification, numerous commercial properties on Main Avenue in Ocean Grove pay "higher and negotiable annual rent and transfer fees," while an employee testified that some non-residential rents factor in the Consumer Price Index.

[4] The Township denied tax exemption to this property, which plaintiff appealed (Docket Number 013693-2017) and as to which parties also filed motions for summary judgment.

Plaintiff sells tickets for concerts it hosts on Saturday nights during summer at the Great Auditorium.[5] Concerts in 2017 and 2018 included certain popular singers or bands paying tribute to famous singers or bands, and classical music. Ticket prices for the former ranged from $30-$65 per person, while for the latter about $20. No merchandise related to the bands playing at the concert is sold at the Great Auditorium, and even if sold it would be outside the Great Auditorium. Some of plaintiff's employees and representatives were positive that plaintiff does not receive any portion of the proceeds, while a former employee stated it depended on the contract and there possibly could have been some sharing of revenues. Plaintiff does not advertise the Great Auditorium as an available venue for entertainment or attractions. Rather, it contacts entertainers and pays them to perform (per plaintiff, such concerts have been declining steadily). Free concerts (Atlantic Wind Ensemble, Ocean Grove Summer Band, organ recitals) and plaintiff's Sunday and weekday worship are also conducted at the Great Auditorium every summer. Plaintiff organizes the annual choir festival (in which choristers from congregations in the tri-state area participate) and the Sacred Masterworks, another choir performance. The Great Auditorium has also on occasion been rented to other spiritual or religious entities such as, for example, the Liquid Church, for conduct of that entity's worship.

Plaintiff also raises revenues from beach badge and boardwalk fees. Seasonal beach badges cost $80-$85 with discounts for youths and seniors. Plaintiff raises revenue by sale of its T-shirts or sweatshirts on the beach. It also receives rent from a vendor of a snack stand on the board walk and from a vendor which/who provides umbrella rentals. All revenues are placed

---

[5] "Permanent tents (actually houses extended in the summer by tents) are clustered around the Great Auditorium . . . a magnificent pile built in 1894 and now a national landmark, seats 7,000." Wyzykowski v. Rizas, 254 N.J. Super. 28, 37, n.1 (App. Div. 1992) (citation and internal quotation marks omitted).

in plaintiff's Beach Fund. The boardwalk is also used to conduct religious/spiritual worship by plaintiff and a local Methodist church, and donations are split between the two.

Plaintiff owns and operates a religious bookstore, The Hub. Revenue is generated from sales of sales of books and other religious paraphernalia.

Plaintiff charges fees or seeks donations in connection with its various cultural activities. For instance, in its Independence Day Parade, for-profits such as food truck vendors pay plaintiff registration fees to cater to the visitors. Vendors cannot sell any drinks and must obtain general liability insurance naming plaintiff as an "additional insured." No part of the vendor(s) proceeds is paid to plaintiff. Vendors are required to comply with any local Township laws including obtaining permits. Participants (such as Marching Bands) can "sponsor" the event at varying amounts ($150 to $1,200) or make donations.

Plaintiff's financial statements as of December 2017 show total income of $5,418,010. Of this, revenues from "performances and recreation" was the largest at $1,755,921. Per plaintiff's former employee, this line item included income from all activities, "mostly the beach" but also the summer Saturday night concerts. This is followed by "rental and property income" at $1,604,826. Revenues from "contributions and gifts" was $1,117,561 and from "temporarily restricted" gifts was $277,384. The operating expense for that period was $5,500,361 of which $4,118,885 was for "program services," $1,049,550 was for "management and general," and $331,926 was for "fundraising." Plaintiff had a net loss of $82,351 for the period. Per certification of plaintiff's Chief Operating Officer, all revenues are used to further plaintiff's mission and for operating expenses without any distribution of revenues to its members akin to profit distribution by a corporate entity to its shareholders.

**ANALYSIS**

**TAX YEAR 2017**

The Township is correct that the court cannot determine the merits of plaintiff's allegation in its complaint that the Township improperly denied tax exemption to the Office for tax year 2017. This court has subject matter jurisdiction only over tax years for which a timely complaint has been filed. N.J.S.A. 54:51A-1. Thus, a tax exemption cannot be granted for prior tax years which were not timely appealed. See Boys' Club of Clifton, Inc. v. Twp. of Jefferson, 72 N.J. 389, 405 (1977); Ironbound Educ. & Cult. Ctr., Inc. v. City of Newark, 8 N.J. Tax 540, 545-46 (Tax 1986) ("plaintiff's failure to file an appeal" for a prior tax year "is fatal to its claim of exemption for that year on any ground."), aff'd, 220 N.J. Super. 346 (App. Div. 1987).

**EXEMPTION FOR TAX YEAR 2018**

*(1) Exemption Under L. 1870, c. 157*

As noted above, this law exempts plaintiff's real and personal property from "all assessment and taxation," as long as the "value" does not exceed $5,000. L. 1870, c. 157, §6. Neither party proffered evidence of what the $5,000 value limit translates to for tax year 2018. Plaintiff's financial statements as of December 31, 2017 values land owned by plaintiff at $324,413 and buildings at $11,132,019. Other property including equipment is valued at $4,812,568. The depreciation (for depreciable property and equipment) is reported as -$416,086 while the "accumulated depreciation" is -$8,941,300. However, the court cannot speculate that the net amount (value less depreciation), in fact, exceeds the $5,000 value limit in the 1870 law.

Without evidence that the Office is worth less than what $5,000 would be worth as of October 1, 2017 (the assessment date for tax year 2018), the court is hesitant to use the 1870 law's tax exemption provision as the basis for deciding the instant summary judgment motions.

10

*(2) Exemption Under Federal Income Tax Laws*

That plaintiff enjoys a federal income tax exemption as an I.R.C. §501(c)(3) organization does not provide a basis to exempt the Office under our local property tax law. See Black United Fund of N.J., Inc. v. City of E. Orange, 17 N.J. Tax 446, 455 (Tax 1998) ("entitlement to a § 501(c)(3) exemption . . .does not mean that the entity is entitled to an exemption under New Jersey law"), aff'd, 339 N.J. Super. 462 (App. Div. 2001).

*(3) Exemption under N.J.S.A. 54:4-3.6*

N.J.S.A. 54:4-3.6 exempts buildings which are used for certain specified purposes, and the supporting land (not exceeding 5 acres). An exemption is afforded to

> all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be Office to taxation and the remaining portion only shall be exempt.

> [Ibid.] (hereinafter "MMI Clause").

The same statute also exempts from tax

> all buildings actually used in the work of associations and corporations organized exclusively for religious purposes, including religious worship, or charitable purposes, provided that if any portion of a building used for that purpose is leased to a profit-making organization or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be Office to taxation and the remaining portion shall be exempt from taxation, and provided further that if any portion of a building is used for a different exempt use by an exempt entity, that portion shall also be exempt from taxation.

> [Ibid.] (hereinafter "Religious/Charitable Clause")

Further, "the buildings, or the lands on which they stand, or the . . . corporations . . . using and occupying them," should not be "conducted for profit." Ibid. But if the building and land is "used for charitable, benevolent or religious purposes" and the "charitable, benevolent or

11

religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings," the exemption is not destroyed provided the "building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes." Ibid. The corporate claimant must be the property owner, incorporated or organized under New Jersey laws, and should be "authorized to carry out the purposes on account of which the exemption is claimed." Ibid.

Our Supreme Court summarized the above as requiring satisfaction of three criteria for an entity to qualify for tax exemption:

> (1) it must be organized exclusively for the [statutorily allowed tax exempt purpose];
> (2) its property must be actually and exclusively[6] used for the tax-exempt purpose; and
> (3) its operation and use of its property must not be conducted for profit.
>
> [Paper Mill Playhouse v. Twp. of Millburn, 95 N.J. 503, 506 (1984).]

(i) Organization Criteria

The Township argues that plaintiff is not a religious institution or a church but an independent affiliate, which exists and operates without any control by or direction from the United Methodist Church or any other Higher Order. Therefore, the Township contends, it is not organized for any specific tax-exempt purpose. Plaintiff counters that the special legislation, its mission statement, charter, and By-Laws, are sufficient evidence that its incorporation fits into either the Religious/Charitable Clause or the MMI Clause. The court agrees with plaintiff.

Because plaintiff was incorporated by statute, there is no need for it to possess an independent Articles of Association. That special legislation is the basis for Plaintiff's claim that it was created exclusively for religious purposes and in its furtherance thereof. Plaintiff's

---

[6] The Legislature subsequently deleted the exclusivity of use requirement.

By-Laws, which were adopted in 1980, also reiterates plaintiff's religious purposes which were recited in the 1870 legislation.

Plaintiff's independence from, control by, or direction from the United Methodist Church or any other higher religious order does not require a conclusion that plaintiff is no longer organized exclusively for religious purposes. It still aligns itself with Methodist faith and beliefs. Its By-Laws (as of 2015) continue to reiterate plaintiff's religious missions and goals, and its committees are tasked with the same religious responsibilities as stated in Celmar. As plaintiff's former employee confirmed, plaintiff still defines itself as Methodist and its Trustee and Board members are Methodists or pastors, which inidcated plaintiff's continued connection with the Methodist Church.

Evidence before the court shows that plaintiff continues to adhere to its original purpose of "providing and maintaining for the members and friends" of the Methodist beliefs and Christian faith, a permanent camp meeting ground to encourage, foster, maintain and renew religious and spiritual way of life. Tents are erected every summer at plaintiff's campgrounds in the Township for these purposes including meditation in, and with nature. Tenters visit and stay every summer at plaintiff's campgrounds. That plaintiff welcomes people of any branch of Christianity as tenters, and to its worships and services does not foreclose a conclusion that plaintiff's organizational purpose and primary objective continues to be influenced by religious beliefs and teachings in its efforts to promote, serve, and further its members' and the public's spiritual and religious needs. Plaintiff continues to conduct regular worships, services, and Bible studies in alignment with the Methodist faith. In summer, during the "tent" months, these activities are even more frequent. The Bishop for the United Methodist Church has preached at

13

plaintiff's property and can appoint or remove plaintiff's current Chief Operating Officer who used to be a pastor at a United Methodist Church.

The court therefore does not view plaintiff's independent status (i.e., with no formal association to the United Methodist Church or any other organized religion) as failing satisfaction of Criteria 1.[7] See e.g. Fountain House of N.J., Inc. v. Twp. of Montague, 13 N.J. Tax 387, 400-01 (Tax 1993) (generally, the "purposes stated in a corporation's certificate of incorporation are reflective of purposes (intent) at the time of incorporation" which can change "over the course of time" and what is relevant are the "purposes pursued by a corporation" and "the facts and circumstances surrounding the corporation's operations . . . as of the applicable assessment date"). While the Township maybe skeptical that plaintiff's mission statement is so broad as to be of no assistance in deciding Criteria 1, the court views such statement as plaintiff's continued goals and objects in keeping with the 1870 special legislation. None of plaintiff's employees or representatives who were deposed disagreed with plaintiff's mission or expressed disagreement with the same vis-à-vis plaintiff's activities. Therefore, plaintiff passes the Criteria 1 test under the Religious/Charitable Clause.

The above facts also permit satisfaction of Criteria 1 of a tax exemption under the MMI Clause. The MMI "classification has been applied to various public and civic organizations, which directly serve the public by contributing to the educational, cultural and spiritual development in society in general." Phillipsburg Riverview Org., Inc. v. Town of Phillipsburg,

---

[7] In 1968, law was enacted to address the United Methodist Church. See N.J.S.A. 16:10A-1 to 10A-15. This law allowed "all religious corporations or churches" which were known as, among others, "'The Methodist Church,' . . . 'Methodist Episcopal Church,' . . . and all . . . associations or other organizations directly connected therewith" to change their name to "The United Methodist Church." N.J.S.A. 16:10A-1. However, the statute does not impair, "limit, change, affect or alter any other existing right, power, property, obligation, liability or duty of any such religious corporation or church." Ibid.

26 N.J. Tax 167, 176 (Tax 2011) (citation omitted), aff'd, 27 N.J. Tax 188 (App. Div. 2013). Plaintiff's object and purpose is to better people's spiritual well-being, and this it attempts to do through worship, education, community awareness, and its annual summer tent camps. Therefore, plaintiff would pass the Criteria 1 test under the MMI Clause.

(ii) Use Criteria

The Township argues that the Office is used to process revenues from plaintiff's activities which are secular or for-profit, thus is a taxable. Per the assessor, the Office is a "business revenue processing" building for plaintiff's activities which are all "revenue oriented . . . no different than any other operating management company" with "its second major source of income [] from rentals as a real estate holding company." And because plaintiff takes no responsibility for maintaining any rented property, it is, the assessor certifies, no different than a real estate holding company. Further, the assessor certifies, the largest source of revenue is from "performances and recreation," the former conducted at the Great Auditorium using secular entertainment bands such as "rock groups playing often offensive music in violation to normal canons of religion." The "religious music occasionally played there" does not alter the fact that raising revenue is why the Great Auditorium is used, per the assessor. Other revenue sources such as annual Independence Day parades are secular, per the Township, therefore the Office which processes revenues from these activities should be taxable, with the same result for revenues from beach badges and fees for use of plaintiff's boardwalk since those charges are no different from any public or private beach therefore, derived from for-profit activities.

Plaintiff does not dispute that it raises or attempts to raise revenue through various means including organizing entertainment and recreation for the community. However, it argues, these efforts are in furtherance of its mission to provide recreation along with religion in a seaside

15

setting.  It also notes that it is not in the business of making profits or income, therefore, does not conduct activities for profit, and that administration of leases is only a small portion of plaintiff's administrative tasks, a majority of which are in connection with its spiritual mission.

The Township's argument blurs Criteria 2 and 3 in that it is arguing that because plaintiff is engaged in non-religious revenue raising activities, by extension, the Office which is used to process revenues from those activities, is also used for secular, for-profit activities, and therefore, the Office is taxable (a loose analogy to the "fruit of a poisonous tree" evidence exclusionary principle or to the proximate cause principle under civil law).  This basis for taxing the Office is problematic because the properties on which these activities are conducted are either already being taxed by the Township (properties subject to ground leases) or are currently tax exempt (the Great Auditorium; boardwalk).  Second, there is no evidence that the Office or any portion thereof is being leased to any for-profit entity.

Third, it is undisputed that the Office is actually used for carrying out several of plaintiff's administrative tasks directly associated with its activities, almost all of which are in connection with its spiritual goals and charitable mission.  All such activities are performed by plaintiff's employees and committee members as authorized by plaintiff's By-Laws.  The employees and committees meet, strategize, manage, coordinate, and execute several aspects of plaintiff's activities concerning adult and children education, and with the spread of community awareness of Christian beliefs and values, at the Office.  In addition to a variety of administrative activities, which includes hosting/developing recreation and entertainment activities, plaintiff's finance committee also performs duties concerning plaintiff's revenues.

That the largest source of revenue was from "programs and recreation" and "rental and property" income per plaintiff's December 2017 financial statements, does not automatically

mean that the largest amount of time, effort, and space in the Office was dedicated to the furtherance of only these two activities. As plaintiff pointed out, rental activities consumed only 20% of one employee's time, who was tasked with other responsibilities as well.

The exemption under either the MMI Clause or the Religious/Charitable Clause requires that the property be "actually used in the work of" the entity organized for that tax-exempt purpose. N.J.S.A. 54:4-3.6 (emphasis added). Based on the facts and evidence provided, the court is satisfied that the Office meets this qualification. The court finds that the Office is integral and essential to the performance and furtherance of plaintiff's activities which are undertaken to promote its spiritual and benevolent goals. Just because plaintiff is not organized as a for-profit entity does not mean that it should conduct its affairs inefficiently without planning or organization. Evidence demonstrates that plaintiff is actively involved in promoting several activities in furtherance of its religious mission and endeavor to foster spiritual faith and belief, and to promote community outreach and well-being. Using the Office as its administrative office to bring it all together is therefore also in furtherance of plaintiff's objectives. This concept was well-captured by the Kansas Supreme Court when it noted that administrative offices of a Methodist Church should be tax exempt because they are "an integral, essential and absolutely necessary part of the" the church's beneficial acts. Board of Trustees v. Cogswell, 473 P.2d 1, 10-11 (Kan. 1970). To tax such offices "would be to ignore the obvious necessity for the administrative function . . . refute the involvement of the executive official in the delivery of socially beneficial services, and . . . discourage the development of well organized institutions serving society through the most effective management techniques." Ibid.

It should also be noted that our precedent even allows an exemption for property which is actually used for a tax-exempt purpose, if it is "reasonably necessary" to carry out the purposes

of the entity. See City of Long Branch v. Monmouth Med. Ctr., 138 N.J. Super. 524, 532 (App. Div. 1976). "[R]easonably necessary" does not equate to "absolutely indispensable." Boys' Club of Clifton, Inc., 72 N.J. at 401. When the issue is whether a building is reasonably necessary for the tax-exempt purpose, the use of that building should be evaluated in terms of how it serves the particular organization. Id. at 401-02. All the facts explicated above allow this court to find that the Office is also reasonably necessary to carry out plaintiff's activities. Thus, the Office satisfies Criteria 2 of the exemption requirement, especially when considered with the reasoning in the next point where the court concludes that plaintiff's revenue raising activities are not conducted for profit.

(iii) Conducted for Profit Criteria

The thrust of the Township's argument is that plaintiff's largest revenue source, "programs and recreation" followed by "rental and property income," is income from secular, for-profit activities. Therefore, it contends, plaintiff fails Criteria 3 of the Paper Mill test, therefore, the Office where the revenues from these two activities is processed, is taxable.

Plaintiff does not dispute the facts of its activities and revenues raised therefrom. It vehemently objects to the Township's characterization of its activities as being commercially motivated with no consideration of its centuries-old religious, charitable, and benevolent mission and purpose which was publicly proclaimed by no less than our Legislature.

The court agrees with plaintiff. That some of the Saturday night entertainers during summer are not, or do not advertise themselves as religious or faith-based (although some singers were born-again Christians, or were Christians willing to sing Christian songs); do not restrict their performances to churches or other religious organizations; and are classified as rock, pop, jazz, or doo-wop in music genres, does not mean that plaintiff's hosting of these entertainers

18

equates to commercial, profit-making activities. While some plaintiff's employees or representatives stated that they personally found lyrics of some songs by these performers morally or spiritually unsavory, they also testified that the purpose of offering such entertainment once a week (Saturday nights) during summer was family friendly and solely in furtherance of plaintiff's mission - to attract youth and members to join and experience plaintiff's spiritual-based beliefs, to educate, and to spread awareness of plaintiff amongst the community and public. As a former pastor and ex-Chief Operating Office of plaintiff, in charge of overseeing the day-to-day operations of plaintiff, testified:

> Q: Would you consider the Beach Boys or Doo-wop concerts as religious?
> . . .
> A: I would say from the way I looked at it . . . the goal was to reach people. All people. All generations. And in doing so it was doing whatever we could to bring people in and get engaged in what's happening. And I believe there are different levels of intent maybe with different . . . programs that were provided. I know with Sunday morning, Sunday evening . . . worship service . . . [was] a preaching service. Opportunities for people to personally make a decision to come to spiritual birth.
> . . .
> The mid week program . . . provided cultural programs where the music . . . might be more Mozart and . . . other kind of classical . . . type music and the goal was to reach people and get people engaged and hopefully to come back to something else and so I think the purpose of the Saturday nights was simply that. Was to get people there, exposed to the Camp Meeting at that level and hopefully engage in other levels with the hope that they would come into a deeper relationship with Christ . . . .
> Q: What would be the purpose to allow a rock group to go to the auditorium in relationship to spiritual rebirth or consistency or anything else?
> A: Exposure and opportunity. I began every Saturday night program with a welcome, announcements . . . and I would open every single one of those Saturday nights with a prayer.
> Q: No matter what group was there?
> A: No matter what group was there.

The Assistant Finance Director testified similarly in her deposition:

> Q: Doo-wop groups from the fifties, does that promote the mission?
> A: In my opinion, ultimately yes in a way it does. We have an opportunity to minister with people, to meet with them. People from all walks of life

that may have never been in our auditorium, seen the facilities we have, might never have stepped foot in Ocean Grove and that is absolutely an opportunity for us to meet with people face-to-face and minister with them, to then, pray with them. Perhaps for the first time in their lives.

This intent in offering entertainment to attract the community, especially youth, is not repugnant to plaintiff's mission. Any religious associations or church would logically attract the people to experience or be part of the association or church if it can offer something youth identify with. Music is undisputedly one such tool.

That the lyrics of each song performed (or to be performed) by a band is not scrutinized or vetted by plaintiff's committee to ensure that the entertainment content is "clean" is not fatal. Performers are made aware about plaintiff's mission before being hired. Each concert hosted by plaintiff at the Great Auditorium is prefaced with a prayer in public by plaintiff's representative. If a performer did something opposed to plaintiff's beliefs, as testified by plaintiff's former employee (performer made remarks about atheism), the performer will not be invited again. While plaintiff can hope that the bands understand plaintiff's spiritual mission and therefore are expected to be family-friendly in their performances, plaintiff cannot be expected to control the performers lyrics or impromptu stage utterances. Tax exemptions should be strictly construed, however, this does not mean that the construction should be unreasonable such that it confines methods used to attract members or participants to plaintiff's faith and beliefs solely to formal religious services and worships, or religious performances/entertainment offered only to the congregation or the followers of plaintiff's Christian beliefs. Plaintiff's incorporating statute was entirely cognizant of plaintiff not being a traditional church in terms of buildings or worship services, thus, recognized its purpose as "providing and maintaining for the members and friends of the Methodist Episcopal Church a proper, convenient and desirable permanent camp meeting ground and [C]hristian seaside resort." L. 1870, c. 157 §1. The phrase "and seaside resort" and

20

"for members and friends" in the statue would be meaningless if plaintiff was not allowed to use the seaside setting to garner followers by using methods such as summer entertainment and beach recreation, in addition to using campgrounds.

The court therefore finds that the Township's insistence that Saturday night summer performances by non-religious groups, and due to certain purportedly offensive lyrics in some songs, renders plaintiff as using the Great Auditorium (and by extension the Office), for the conduct of secular for-profit activities is not meritorious. This is especially where the Great Auditorium is used for numerous free concerts, choir festivals, Sunday and weekday worship by plaintiff or other religious entities, throughout the week each summer and purely for worship/religious activities after summer. The argument also lacks merit when no attempt is being made by the Township to address taxability of the Great Auditorium. The court is therefore unpersuaded that the Office should be taxable simply because it processes revenues/expenses in connection with the Saturday night summer "secular" concerts held at the Great Auditorium.

The court is also unpersuaded that the Office is taxable because it is used to process rents and manage plaintiff's rental activities. Regardless of the annual ground lease amounts, it is undisputed that buildings leased by plaintiff to commercial tenants pay local property tax to the Township. Also undisputed is that residential properties are similarly taxed to the property owners. No tenant or homeowner pays any tax to plaintiff in this regard. There was no evidence to show that plaintiff is leasing properties to commercial or for-profit entities as to which no local property tax was being paid. Indirectly taxing the Office when local property tax is being collected from the tenants or owners of properties subject to ground lease(s), is unwarranted. If the Township has evidence that plaintiff is renting real property to a for-profit, and that rented property is not taxed, it should attempt to directly tax that property, not indirectly deny tax

21

exemption to the Office where the revenue is processed. This is especially where the ground rents are used to help fund ministries which need to be subsidized since children's program costs are high and Christian programming is free, and the ground rents "ensure[] that Ocean Grove will be preserved and continue to create a religious seaside community."

It is unclear whether the Township is claiming that revenues from the summer tent rentals renders plaintiff's use of the campgrounds as conducting a for-profit endeavor. If it is, then no attempt is being made by the Township to address any denial of tax exemption for the campgrounds. Therefore, it is difficult to agree that the Office should be taxable because it processes revenues received and expenses incurred in connection the annual summer tents. In any event, those rentals are directly in connection with plaintiff's religious activities.

The Township notes that the largest source of revenue (for the period ending December 31, 2017) is from "performance and recreation" followed by "rental and property income," therefore, it must be true that plaintiff is engaging in secular for-profit activities. The court is unpersuaded. While these activities do raise significant revenue for plaintiff, the facts as a whole evidence that these activities are undertaken in furtherance of plaintiff's spiritual mission and goals, not as a sacrifice to those spiritual goals. Plaintiff's third largest source of revenue per its financial statements provided to the court, is contributions and gifts ($1,117,561 excluding "temporarily restricted" gifts of $277,384), which weakens the Township's inferential argument.

Plaintiff's revenues from community-based outreach events such as the annual Independence Day parade does not make the Office taxable simply because for-profit food truck vendors pay plaintiff registration fees to cater to the visitors. Other than a small registration fee, plaintiff does not receive any portion of the vendor(s) proceeds. It is even unclear whether these vendors are located on Township owned streets or plaintiff's property. They are certainly not

22

using the Office. Further, the parade "sponsorship" is a form of fund raiser. It is not a for-profit activity. Note that the application states that since "[e]very group or participant in the parade affects the message conveyed" by plaintiff, plaintiff can "refuse participation to any group or unit whose intended or anticipated message would conflict with [plaintiff's] communicative purposes." The application also notes plaintiff's mission of "Spiritual Birth, Growth, Renewal." Deposition testimony of plaintiff's employees also shows that these activities are undoubtedly civic but with the underlying intent of spreading community and public awareness of plaintiff's religious and spiritual Christian mission. Plaintiff's trustees and committee members march in the parade. Its youth is involved in organizing and running the event. Therefore, the revenues from the parade, similar to revenues from the summer concerts, do not equate to conduct of for-profit activity by plaintiff at the Office.

Plaintiff's hosting of community related events only establish that it endeavors to exist in a harmonious relationship with the community and with the summer shore visitors. While its activities may be viewed as secular (since plaintiff welcomes people of any religion to experience spirituality through the Bible), the court does not find it abhorrent to plaintiff's religious and spiritual mission of enriching the public through Christianity in a seaside setting. See e.g. Walz v. Tax Comm'n, 397 U.S. 664, 687-88 (1970) (two secular purposes for exempting religious organizations from property taxation are: (1) they "contribute to the well-being of the community in a variety of nonreligious ways, and thereby bear burdens that would otherwise either have to be met by general taxation, or be left undone, to the detriment of the community" and (2) "they uniquely contribute to the pluralism of American society by their religious activities") (Brennan, J., concurring). Thus, church facilities are used not only for religious worship and study, but also for activities beneficial to the community as a whole, such as gatherings to participate in

23

Boy Scout activities, to promote anti-poverty causes, to discuss public issues, or to listen to chamber music. Id. at 688.

Most importantly, all revenues are deposited in the general operating account and spent or used for plaintiff's operating expenses. Plaintiff's financial statements show $4,118,885 as being spent for "Program Services." As noted above, plaintiff is involved in several benevolent programs, adult and youth based. This is in accord with plaintiff's incorporating statute. See L. 1870, c. 157, §6 ("Any surplus funds remaining . . . after defraying the necessary expenses thereof for improvements or otherwise," is to be "devoted to such charitable, benevolent or religious objects or purpose" as agreed to by plaintiff's trustees). It also accords with N.J.S.A. 54:4-3.6 that the tax exemption is not destroyed if "charitable, benevolent or religious work" conducted in a building used for these purposes, and "is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings," provided the "building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes." Plaintiff's 2017 financial statements do not evidence any revenues being diverted to its Trustees or members (outside of salaries and pension plans). Rather, they show that all incoming revenues, including gifts, donations, charitable contributions are used to meet operating expenses, management expenses, and funding of various endowments or specific funds.

**CONCLUSION**

For the aforesaid reasons, denial of tax exemption for the Office simply because it is being used as an administrative office to process revenues garnered by plaintiff in furtherance of its mission is thus unwarranted whether under Criteria 1, 2 or 3 of Paper Mill. Therefore, the court reverses the Township's denial of tax exemption for the Office for tax year 2018. Because

24

both parties raised the issue of valuation in their respective pleadings (complaint and counterclaim), the court will enter an Order and a Final judgment only as to the exemption issue by granting plaintiff's cross-motion for summary judgment for 2018. The tax exemption issue will not impact or affect the valuation issue which can therefore proceed independent of, and without impact on the above-decided exemption issue. Therefore, there is no reason to cause delay in issuing a final judgment as to the tax exemption issue for purposes of R. 4:42-2.

Very Truly Yours,

Mala Sundar, P.J.T.C.

25